935 P.2d 1294 (1997)
132 Wash.2d 1
The STATE of Washington, Respondent,
v.
Ronald Floyd VALENTINE, Petitioner.
No. 62274-4.
Supreme Court of Washington, En Banc.
Argued March 27, 1996.
Decided May 1, 1997.
Brian C. O'Brien, Spokane, for Petitioner.
Jim Sweetser, Spokane County Prosecutor, Kevin M. Korsmo, Deputy, Spokane, for Respondent.
ALEXANDER, Justice.
Ronald Valentine obtained review of a decision of the Court of Appeals, Division Three, affirming his conviction on a charge of third degree assault, a charge that was based on an allegation that Valentine assaulted a law enforcement officer while the officer was engaged in performance of his official duties. Valentine contends on appeal that the trial court erred in instructing the jury that "[t]he use of force to prevent an unlawful arrest which threatens only a loss of freedom ... is not reasonable." Instruction 17, Clerk's Papers at 71.[1] He also contends that this court should overturn his conviction and dismiss the assault charge for what he claims was outrageous conduct of the Spokane police, which violated his right to due process of law. We reject both contentions and, therefore, affirm.
*1295 In the early afternoon of May 16, 1990, in downtown Spokane, Spokane Police Officer Rick Robinson observed what he believed was a "suspicious subject on the corner at First and Jefferson." Verbatim Report of Proceedings (VRP) at 88. Upon making this observation, Robinson radioed another Spokane police officer, John Moore, and asked him if he knew the person standing at First and Jefferson "wearing a black coat." VRP at 28. Moore proceeded to that location and observed a person wearing a black jacket enter a car. Although Moore was unable to immediately identify that person, he followed the car as the person drove it away.
According to Moore, the car soon made a turn without signaling. Moore, who was driving an unmarked car, advised Robinson over his radio that he was going to stop the car. He then attempted to do so by placing a rotating blue light on his dashboard, flashing his headlights, and honking his horn. While attempting to stop the automobile, Moore recognized that the driver of the car he was following was Ronald Valentine.[2] Moore broadcast over his police radio that he was following Valentine and that Valentine was not heeding Moore's efforts to stop him. Shortly thereafter, Valentine stopped his automobile and Moore pulled his car in behind him. Officer Robinson also pulled in behind Moore as did several other officers who had overheard the radio broadcasts.
All of the police officers who arrived at the scene testified at trial. Their version of the events that transpired after the traffic stop varied dramatically from Valentine's version of events. Moore said that upon confronting Valentine he asked to see his license and registration. This, he indicated, prompted Valentine to ask, "Why?" VRP at 37. Moore said that he then told Valentine that he was being cited for failing to signal for a turn. According to Moore, Valentine said that since Moore had given him a ticket a few days earlier, he had all the information that he needed. Moore said that he again asked for the driver's license and registration and Valentine responded by saying that "you ... cops are just harassing me. I'm Black, and I'm tired of the harassment." VRP at 38. After what Moore said was his third request of Valentine to produce his driver's license and registration, Valentine produced it.
Moore testified that he asked Valentine for his current address and that Valentine told Moore to "[l]ook it up." VRP at 41. Moore then asked Valentine if he was going to cooperate and sign a citation and, according to Moore, Valentine said that he would not do so. Moore then informed Valentine that he was being placed under "arrest for failure to cooperate .... [and] refusing to sign an infraction." VRP at 45.
Moore also testified that after Valentine walked to the front of the car to show Moore that the car Valentine had been driving had a front license plate, Valentine returned to his car door, opened it, and started to reach inside the car. Moore said that he told Valentine to stay out of the car and grabbed Valentine's left arm to prevent him from reaching into the car. Robinson also claimed that he grabbed Valentine's right arm in a similar effort to keep Valentine from entering his car. Valentine, according to Moore, responded to their actions by spinning toward Moore and punching him in the side of the head. Robinson also claimed that he was hit in the ensuing skirmish.
Spokane Police Officers Jones, Webb, and Yates all testified that they joined the scuffle when Valentine began to struggle with Moore and Robinson. They said that they eventually subdued Valentine and forced him to the ground. Yates, who indicated that he had decided to assist Moore in effecting the traffic stop when he heard over the radio that it was Valentine who was being pursued,[3] testified that when he became involved in the fracas, he felt Valentine's hand on his *1296 gun butt. He said that in order to subdue Valentine, he had to apply a "carotid hold"[4] to Valentine's neck.
Valentine was eventually placed in handcuffs and was transported to jail. A nurse supervisor at the jail refused to admit Valentine because of his apparent injuries. Valentine was then taken to a hospital where Moore presented him with a citation for failing to signal for a turn. Valentine signed the citation. Valentine was later booked into the Spokane County Jail where he was charged by information with two counts of third degree assault, it being alleged that he assaulted Moore and Robinson while they were performing "official duties." Clerk's Papers at 1.
Valentine testified at trial on his own behalf. He claimed that because his turn signals were not functioning, he used hand signals to indicate his intention to turn. He also said that he stopped his car as soon as it was possible for him to do so. Valentine indicated that before reaching inside his car, he told Moore he was going to lock his car in order to protect some personal items. He denied that he told Moore to look up his address for himself. He also said that he did not throw the first punch, asserting that any blows he delivered were in self-defense and amounted to reasonable force to protect himself from an illegal arrest. Valentine contended that he would have signed a citation on the scene if he had been presented with one. Valentine was found guilty of assaulting Moore and not guilty of assaulting Robinson.

I
Valentine asks us to decide whether the trial court erred in instructing the jury regarding the employment of force to resist an unlawful arrest. Instruction 17 reads as follows:
A person unlawfully arrested by an officer may resist the arrest; the means used to resist an unlawful arrest must be reasonable and proportioned to the injury attempted upon the party sought to be arrested. The use of force to prevent an unlawful arrest which threatens only a loss of freedom, if you so find, is not reasonable.

Clerk's Papers at 71 (emphasis added).
Valentine claims that the instruction is faulty insofar as it informs the jury that a person may not use force to resist an unlawful arrest which threatens only a loss of freedom. He asserts that it is the law in this state that reasonable and proportional force may always be employed to resist an unlawful arrest. Valentine bases his argument to a large extent on this court's opinion in State v. Rousseau, 40 Wash.2d 92, 241 P.2d 447 (1952). There, a person who was being unlawfully arrested used what this court described to be the equivalent of a "deadly weapon" when he pushed a police officer who was in the act of arresting him into the path of an oncoming automobile. In concluding that the jury could have found that the defendant used unnecessary force in resisting his arrest, we said "[i]t is the law that a person illegally arrested by an officer may resist that arrest," and suggested further that force could be employed in doing so, but not with "extreme measures" if only a loss of liberty is threatened. Rousseau, 40 Wash.2d at 94, 241 P.2d 447.
At the outset, we note that it is unnecessary for us to decide the validity of instruction 17 as it might affect Valentine's trial. That is so because the claimed error of law in the instruction makes a difference if and only if the arrest of Valentine was unlawful. Significantly, Valentine has never claimed that his arrest was unlawful, either in the trial court or the Court of Appeals. Valentine's trial theory, rather, was that the Spokane *1297 police officers assaulted him during the course of the arrest and that he was merely defending himself against that assault. Consequently, neither the trial judge nor the jury was asked to decide if Valentine's arrest was unlawful. The question of whether instruction 17 improperly skewed the result of the jury verdict does not, therefore, arise, because in the absence of an unlawful arrest, there can be no issue as to whether one can use force to resist an unlawful arrest. Thus, it was not necessary for this court to accept review of this case in order to answer the question of whether it is lawful in Washington to use reasonably proportioned force to resist an unlawful arrest.
Nevertheless, both parties have placed that issue sharply in focus both in their briefing and at oral argument, which consisted largely of discussion of this very issue. In our review of the law, beginning with Rousseau, we have discovered that cases from our court and from the Court of Appeals have created confusion as to whether one who is illegally arrested may resist the arrest when the arresting officer's acts threaten only a loss of liberty. For example, although the Court of Appeals has cited Rousseau for the proposition that a defendant was justified in resisting an unlawful arrest, State v. Schulze, 51 Wash.2d 878, 883, 322 P.2d 839 (1958), the Court of Appeals, two decades after Rousseau, stated the rule: "In State v. Rousseau, 40 Wash.2d 92, 241 P.2d 447 (1952), it was held that one may not resist with deadly force an unlawful arrest which merely threatens to deprive him of his liberty and not to do great bodily harm." State v. Madry, 12 Wash.App. 178, 181, 529 P.2d 463 (1974), review denied, 85 Wash.2d 1004 (1975). In State v. Westlund, 13 Wash.App. 460, 536 P.2d 20, 77 A.L.R.3d 270, review denied, 85 Wash.2d 1014 (1975), the confusion was furthered when, after stating the Rousseau rule as "one may resist an unlawful arrest by an amount of force reasonable and in proportion to the injury the arrestee faces," the Court of Appeals said, "the arrestee's right to freedom from arrest without excessive force that falls short of causing serious physical injury or death can be protected and vindicated through legal processes, whereas loss of life or serious physical injury cannot be repaired in the courtroom." Westlund, 13 Wash.App. at 465, 467, 536 P.2d 20. The latter statement apparently led the Court of Appeals in State v. Goree, 36 Wash. App. 205, 209, 673 P.2d 194 (1983), review denied, 101 Wash.2d 1003 (1984), to say "[t]he use of force to prevent even an unlawful arrest which threatens only a loss of freedom is not reasonable." Indeed, the status of Washington's law on this subject was even confusing to courts in other jurisdictions. See Glover v. State, 88 Md.App. 393, 594 A.2d 1224, 1231 n. 5 (1991) (listing Washington as one of the states to have abrogated the common law rule allowing resistance to unlawful arrests, and citing Westlund as authority).
Unfortunately, this court has not alleviated the confusion in this area. In State v. Hornaday, 105 Wash.2d 120, 131, 713 P.2d 71 (1986), we said the following in the same paragraph: "A person illegally arrested by an officer may resist the arrest; the means used to resist an unlawful arrest must be reasonable and proportioned to the injury attempted upon the party sought to be arrested. `The use of force to prevent even an unlawful arrest which threatens only a loss of freedom is not reasonable.'" Hornaday, 105 Wash.2d at 131, 713 P.2d 71 (quoting Goree, 36 Wash.App. at 209, 673 P.2d 194) (citations omitted). Because any arrest, lawful or unlawful, threatens at least a loss of freedom, the second sentence appears to be incompatible and inconsistent with the first.
In a similar vein, counsel for Valentine suggested at oral argument that our recent decision in State v. Mierz, 127 Wash.2d 460, 476, 901 P.2d 286 (1995), overruled Rousseau sub silentio. In Mierz, a unanimous decision, we said, citing Hornaday: "An arrestee charged with assault upon a law enforcement officer must show that there was an imminent threat of serious physical harm in connection with an unlawful arrest in order to establish legitimate use of force in self-defense."[5] *1298 Mierz, 127 Wash.2d at 476, 901 P.2d 286.
As a result of this confusion in our law, we depart from our usual practice of not ruling on issues unless it is necessary to resolve a case, and proceed with reconsideration of the proposition we advanced in Rousseau, namely, that it is not unlawful to use reasonably proportioned force to resist any illegal arrest.
In Rousseau, a 1952 case, we recited the common law rule prevalent in most jurisdictions at the time: "It is the law that a person illegally arrested by an officer may resist that arrest, even to the extent of the taking of life if his own life or any great bodily harm is threatened." Rousseau, 40 Wash.2d at 94, 241 P.2d 447 (citing John Bad Elk v. United States, 177 U.S. 529, 20 S.Ct. 729, 44 L.Ed. 874 (1900), and State v. Gum, 68 W.Va. 105, 69 S.E. 463 (1910)).
Gum, in turn, relied heavily on cases from Iowa, State v. Row, 81 Iowa 138, 46 N.W. 872 (1890); California, People v. Denby, 108 Cal. 54, 40 P. 1051 (1895); and Florida, Roberson v. State, 43 Fla. 156, 29 So. 535 (1901). Gum, in fact, quoted from the Florida case the language we adopted in Rousseau. Gum, 68 W.Va. at 112, 69 S.E. 463. Although the law regarding this issue has not changed in West Virginia since 1910, the West Virginia Supreme Court has had occasion to address it only once since then, nearly half a century ago in State v. McCauley, 130 W.Va. 401, 43 S.E.2d 454 (1947). By contrast, the law in the three states on which Gum most relied Iowa, California, and Floridahas changed. It is now illegal in each of those states to resist even an unlawful arrest.[6]
Likewise, Rousseau also relied on State v. Robinson, 145 Me. 77, 72 A.2d 260 (1950), for the proposition that an illegal arrest is an assault and battery, thereby justifying the use force to resist. Rousseau, 40 Wash.2d at 95, 241 P.2d 447. The Robinson court said "[a]n illegal arrest is an assault and battery. The person so attempted to be restrained of his liberty has the same right, and only the same right, to use force in defending himself as he would have in repelling any other assault and battery." Robinson, 72 A.2d at 262. The Supreme Judicial Court of Maine set Robinson aside in 1978, however, holding "Robinson no longer states the law of Maine." State v. Austin, 381 A.2d 652, 653 (Me.1978). Construing as a whole several sections of Maine's penal code, the court concluded, "The legislature has thus cast the advantage on the side of law enforcement officers, leaving the person arrested in most cases to pursue his rights, not through violent self-help, but through prompt hearing before a magistrate with prompt consideration for release on bail or personal recognizance." Austin, 381 A.2d at 655 (footnote omitted).
Thus, the theoretical footings on which we based our decision in Rousseau have eroded with the passage of time. It is therefore meet and fitting that we reconsider now the bases for our decision in Rousseau. Reconsidering cases such as Rousseau "enables the law under stare decisis to grow and change to meet the ever-changing needs of an ever-changing society and yet, at once, to preserve the very society which gives it shape." State ex rel. Washington State Fin. Comm. v. *1299 Martin, 62 Wash.2d 645, 673, 384 P.2d 833 (1963).
1. Historical Background of the Common Law Rule. The English common law right forcibly to resist an illegal arrest was established almost three hundred years ago in The Queen v. Tooley, 92 Eng.Rep. 349, 351-52 (1909). The facts of Tooley are necessary for proper analysis, but, unfortunately, are rarely discussed in the cases.[7]
A statute enacted in the twenty-seventh year of the reign of Elizabeth I for the purpose of "reformation of disorders" allowed certain officials of London to "hear and punish incontinencies." Tooley, 92 Eng. Rep. at 349. One nonmedical meaning of incontinent is unchaste, or of unrestrained sexual appetite, or lewdness. Pursuant to a warrant issued in accordance with this statute, Constable Samuel Bray set about rounding up the "usual suspects" within the City of Westminster. Between 8 and 9 o'clock on the night of March 8, Constable Bray apprehended Mistress Anne Dekins "in the street between the play-house and the Rose Tavern." Tooley, 92 Eng.Rep. at 349. He suspected her of being a disorderly person, having previously arrested her for being disorderly. The trial court later disagreed with Bray, finding that he had no reason to arrest her, as she was not misbehaving at the time.
On the way to jail, three men, all strangers to Anne Dekins, drew their swords and attempted to rescue her from Constable Bray's custody. The case does not say what motivated these three strangers to attempt the rescue. The constable "shewed" them his constable's staff, and declared himself to be on the Queen's business. They chose then to desist and Bray "carried the woman to the round-house[.]" Tooley, 92 Eng.Rep. at 350. An important point is that the three strangers did not see the unlawful arrest of Mistress Dekins; they saw her only under restraint as Bray led her to jail.
Shortly thereafter, with Mistress Dekins safely locked up, the same three men again assaulted Constable Bray outside the jail for the purpose of obtaining her release. Bray called for assistance, and Joseph Dent came to his aid. One of the three then killed Dent with a sword. The issue at trial was whether the three were guilty of murder or manslaughter. Under the law at the time, one who killed another without provocation was guilty of murder. If provocation were present, the crime was manslaughter. Thus, the question for the court was whether the arrest of Mistress Anne Dekins was sufficient provocation to the three strangers to excuse their actions and prevent a conviction for murder.
The case was argued on appeal "before all the Judges of England at Serjeant's-Inn in Chancery-Lane," and resulted in a 7-5 verdict for manslaughter. Tooley, 92 Eng.Rep. at 352. Chief Justice Holt of the King's Bench delivered the decision of the court:
The prisoners [the accused] in this case had sufficient provocation; for if one be imprisoned upon an unlawful authority, it is a sufficient provocation to all people out of compassion; much more where it is done under a colour of justice, and where the liberty of the subject is invaded, it is a provocation to all the subjects of England.... Constables have an authority by the statute to arrest persons, but that must be by warrant from the justices of the peace; but in this case there was no warrant.
Tooley, 92 Eng.Rep. at 352. To the argument that the three strangers could not have been provoked because they were strangers to Mistress Dekins, the Chief Justice answered: "but sure a man ought to be concerned for Magna Charta and the laws; and if any one against the law imprisons a man, he is an offender against Magna Charta." Tooley, 92 Eng.Rep. at 353.
But how could three strangers who did not even witness the arrest know the arrest was *1300 unlawful? Chief Justice Holt rejoined, "but surely ignorantia facti will excuse, but never condemn a man. Indeed, he acts at his peril in such a case, but he must not lose his life for his ignorance." Tooley, 92 Eng.Rep. at 353. In other words, the three strangers acted at their perilhad it been decided later that the arrest was in fact lawful, they would have been found guilty of murder. Because the court later determined the arrest to have been unlawful, the court held they had been properly provoked, and could be guilty only of manslaughter, not murder.
The important point to note is that Tooley is not about Mistress Anne Dekins's right to resist her unlawful arrest. It is about the right of others, strangers, to resist her unlawful arrest. The "provocation" the Tooley court spoke of was not the provocation of Mistress Dekins. It was the provocation of the three strangers at seeing someone unlawfully imprisoned, and whether that provocation provided sufficient reason to reduce their conviction from murder to manslaughter. Nevertheless, the Tooley rule has come down to us as a rule permitting an arrestee to use the necessary force (but no more) to resist an unlawful arrest.[8]
To understand why an unlawful arrest was such a great provocation as to affect "all people out of compassion," it is necessary to look at the historical evidence of the state of English prisons in the eighteenth century.
2. English Prisons. Professor Sam Bass Warner of Harvard Law School was instrumental in the 1940's in setting forth the historical background leading to the abandonment of the Tooley rule in the majority of states. "The [Tooley] rule developed when long imprisonment, often without the opportunity of bail, `goal [sic] fever,' physical torture, and other great dangers were to be apprehended from arrest, whether legal or illegal." Sam B. Warner, The Uniform Arrest Act, 28 VA.L.REV. 315, 330 (1942).
In an earlier article, Professor Warner described in more detail the horrors awaiting those arrested:
Since jailers were held responsible for escapes and many jails were constructed for some other purpose and hence easy to break out of, prisoners were often kept in irons. Those without the means to buy better accommodations were frequently huddled together in dark, filthy rooms, in close proximity to depravity and disease. Under such conditions, imprisonment until the next term of court was often equivalent to a death sentence, especially during the frequent periods when prisons were swept by a malignant form of typhus known as "gaol fever."[9] In 1759 an English authority estimated that each year a fourth of the people in prison died there.[10]
Sam B. Warner, Investigating the Law of Arrest, 26 A.B.A.J. 151, 152 (1940). Others *1301 have also chronicled the deplorable conditions of English jails:
In several prisons there was no food allowance; in others it consisted of a meager bread ration. "Water soup" (bread boiled in water) was not uncommon fare. Prisoners who received bread allowances on alternate days were so hungry that they often ate the entire amount the first morning and then went hungry the rest of that day and the next. Persons who entered jail in the picture of health, emerged scarcely able to move from hunger, and incapable of any labor for weeks thereafter.
No medical facilities were available in the prisons. The air was foul and noxious from the "effluvia" of the sick and the lack of sewage facilities. Prisoners were crowded together in close rooms and underground dungeons and chains were often required to prevent escape. Men were not separated from women, nor the sane from the insane....
In addition, every incident of prison life from admission to discharge was made the occasion for levying fees against the prisoners. There were charges for the arrest, for the privilege of detention in this or that part of the prison, for bed and bedding, for food and other "conveniences" of life, and for release. In Massachusetts at the end of the seventeenth century those who were unable to pay their fees "might be sold for life or a period of years into the service of anybody willing to pay their fees."
Comment at 122 n. 16 (citation omitted) (quoting Warner, Investigating the Law of Arrest, 26 A.B.A.J. 151, at 152). As one commentator put it, "Where imprisonment was often the equivalent of a death sentence, or at least, a living death, one can understand why men resisted unlawful arrest." Comment at 123. One can also understand why, as the Tooley court said, an unlawful arrest was a great provocation affecting "all people out of compassion." Tooley, 92 Eng. Rep. at 352. The common law rule set out in Tooley plainly resulted from conditions that no longer exist.
3. Modern Arrest and Incarceration. In Washington today the law provides those arrested with numerous protections that did not exist when the common law rule arose. Reasonable bail is available. WASH. CONST., art. I, § 20; Westerman v. Cary, 125 Wash.2d 277, 291-92, 892 P.2d 1067 (1994). At any critical stage in a criminal prosecution a defendant has a right to appointed counsel under both the federal constitution's Sixth Amendment and our state constitution's article I, section 22 (amend. X). Coleman v. Alabama, 399 U.S. 1, 7, 90 S.Ct. 1999, 2002, 26 L.Ed.2d 387 (1970); Heinemann v. Whitman County, 105 Wash.2d 796, 799-800, 718 P.2d 789 (1986). Gerstein v. Pugh, 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975), held the Fourth Amendment requires a prompt judicial determination of probable cause as a prerequisite to an extended pretrial detention following a warrantless arrest. None of these rights was available in 1709. "[T]he right to resist developed when the procedural safeguards which exist today were unknown." State v. Hatton, 116 Ariz. 142, 568 P.2d 1040, 1045 (1977).
Not only has criminal procedure advanced to protect the rights of the accused, jails themselves are no longer the pestilential death traps they were in eighteenth century England. Recent Eighth Amendment litigation of prisoners' claims of cruel and unusual punishment has established certain constitutional standards for prisons. See, e.g., Estelle v. Gamble, 429 U.S. 97, 104-05, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976) (prohibiting "deliberate indifference to serious medical needs"), reh'g denied, 429 U.S. 1066, 97 S.Ct. 798, 50 L.Ed.2d 785 (1977); Gregg v. Georgia, 428 U.S. 153, 173, 183, 96 S.Ct. 2909, 2925, 2929-30, 49 L.Ed.2d 859 (1976) (prohibiting the "unnecessary and wanton infliction of pain," which includes sanctions so lacking in penological justification that they constitute the "gratuitous infliction of suffering"), reh'g denied, 429 U.S. 875, 97 S.Ct. 197, 50 L.Ed.2d 158 (1976). The United States Supreme Court "has determined that most of the constitutional rights contained in the Bill of Rights survive incarceration." Michael *1302 B. MUSHLIN, RIGHTS OF PRISONERS 13 (2d ed. 1993).
Thus, "[i]n this era of constantly expanding legal protection of the rights of the accused in criminal proceedings, an arrestee may be reasonably required to submit to a possibly unlawful arrest and to take recourse in the legal processes available to restore his liberty." Commonwealth v. Moreira, 388 Mass. 596, 447 N.E.2d 1224, 1227 (1983). "The concept of self-help is in decline. It is antisocial in an urbanized society. It is potentially dangerous to all involved. It is no longer necessary because of the legal remedies available." State v. Koonce, 89 N.J.Super. 169, 214 A.2d 428, 436 (1965). We agree.
4. The Trend Away From the Common Law Rule. In 1966, the right to resist an unlawful arrest was recognized in 45 out of 50 states. At that time the five states that had abrogated the right were Rhode Island, New Hampshire, Delaware, California, and New Jersey. Max Hochanadel & Harry W. Stege, Note, Criminal Law: The Right to Resist an Unlawful Arrest: An Out-Dated Concept?, 3 TULSA L.J. 40, 46 (1966). By 1983, however, 25 of those 45 states had revoked the common law rule either by statute[11] or decision,[12] and today, only 20 states have it in place, while resisting even an unlawful arrest is prohibited by law in 30 states. "[T]his common law principle has suffered a devastating deluge of criticism." State v. Thomas, 262 N.W.2d 607, 610 (Iowa 1978) (rule is "an anachronistic and dangerous concept"). Thus, the hold of the common law rule has weakened substantially in the last 30 years as jurisdiction after jurisdiction has modernized its jurisprudence to reflect the differences in criminal procedure in late twentieth century America as compared to early eighteenth century England. "[T]he trend in this country has been away from the old rule and toward the resolution of disputes in court." Moreira, 447 N.E.2d at 1226.
Courts addressing the question have set out many cogent and compelling reasons for consigning the common law rule to the dustbin of history. For example:
While society has an interest in securing for its members the right to be free of unreasonable searches and seizures, society also has an interest in the orderly resolution of disputes between its citizens and the government. (United States v. Ferrone (3d Cir.1971) 438 F.2d 381, 390.) Given such competing interests, we opt for the orderly resolution through the courts over what is essentially "street justice."[13]
Evans v. City of Bakersfield, 22 Cal.App.4th 321, 27 Cal.Rptr.2d 406, 412 (1994).

*1303 While defendant's rights are no doubt violated when he is arrested and detained a matter of days or hours without probable cause, we conclude the state in removing the right to resist does not contribute to or effectuate this deprivation of liberty. In a day when police are armed with lethal and chemical weapons, and possess scientific communication and detection devices readily available for use, it has become highly unlikely that a suspect, using reasonable force, can escape from or effectively deter an arrest, whether lawful or unlawful. His accomplishment is generally limited to temporary evasion, merely rendering the officer's task more difficult or prolonged. Thus self-help as a practical remedy is anachronistic, whatever may have been its original justification or efficacy in an era when the common law doctrine permitting resistance evolved.... Indeed, self-help not infrequently causes far graver consequences for both the officer and the suspect than does the unlawful arrest itself. Accordingly, the state, in deleting the right to resist, has not actually altered or diminished the remedies available against the illegality of an arrest without probable cause; it has merely required a person to submit peacefully to the inevitable and to pursue his available remedies through the orderly judicial process.
People v. Curtis, 70 Cal.2d 347, 450 P.2d 33, 36-37, 74 Cal.Rptr. 713 (1969) (footnote and citation omitted).
We are of the opinion that the common law rule is outmoded in our modern society. A citizen, today, can seek his remedy for a policeman's unwarranted and illegal intrusion into the citizen's private affairs by bringing a civil action in the courts against the police officer and the governmental unit which the officer represents. The common law right of forceful resistance to an unlawful arrest tends to promote violence and increases the chances of someone getting injured or killed.
Fields v. State, 178 Ind.App. 350, 382 N.E.2d 972, 975 (1978).
More important [than the existence of civil remedies], however, are the unwarranted dangers to civil order caused by this lingering artifact. Peace officers are today lethally armed and usually well trained to efficiently effect arrests. Resultantly, the resister's chances of success are seriously diminished unless he counters with equal or greater levels of force. The inevitable escalation of violence has serious consequences for both participants and innocent bystanders.
Briefly stated, a far more reasonable course is to resolve an often difficult arrest legality issue in the courts rather than on often hectic and emotion laden streets. Modern urbanized society has a strong interest in encouraging orderly dispute resolution. Confronting this is the outmoded common law rule which fosters unnecessary violence in the name of an obsolete self-help concept which should be promptly discarded.
Thomas, 262 N.W.2d at 611. We agree with all of these sentiments. Finally, we also associate ourselves with Judge Learned Hand, who said,
The idea that you may resist peaceful arrestand mind you, that is all it is because you are in debate about whether it is lawful or not, instead of going to the authorities which can determine, seems to me not a blow for liberty but, on the contrary, a blow for attempted anarchy.
35 A.L.I.PROC. 254 (1958).
In the final analysis, the policy supporting abrogation of the common law rule is sound. That policy was well enunciated by Division Two of the Court of Appeals in State v. Westlund, 13 Wash.App. 460, 467, 536 P.2d 20, 77 A.L.R.3d 270, review denied, 85 Wash.2d 1014 (1975), where the court said:
[T]he arrestee's right to freedom from arrest without excessive force that falls short *1304 of causing serious injury or death can be protected and vindicated through legal processes, whereas loss of life or serious physical injury cannot be repaired in the courtroom. However, in the vast majority of cases, as illustrated by the one at bar, resistance and intervention make matters worse, not better. They create violence where none would have otherwise existed or encourage further violence, resulting in a situation of arrest by combat. Police today are sometimes required to use lethal weapons for self-protection. If there is resistance on behalf of the person lawfully arrested and others go to his aid, the situation can degenerate to the point that what should have been a simple lawful arrest leads to serious injury or death to the arrestee, the police or innocent bystanders. Orderly and safe law enforcement demands that an arrestee not resist a lawful arrest and a bystander not intervene on his behalf unless the arrestee is actually about to be seriously injured or killed.
We found these policy reasons "convincing" and adopted the holding of Westlund in State v. Holeman, 103 Wash.2d 426, 430, 693 P.2d 89 (1985). We affirm today our statements in Holeman.
In sum, we hold that, although a person who is being unlawfully arrested has a right, as the trial court indicated in instruction 17, to use reasonable and proportional force to resist an attempt to inflict injury on him or her during the course of an arrest, that person may not use force against the arresting officers if he or she is faced only with a loss of freedom. We explicitly overrule Rousseau and other cases that are inconsistent with our holding in this case.
Before leaving this issue, we take note of the dissent's assertion that the majority's holding "makes the unlawful arrest of Valentine irrelevant." Dissenting op. at 1321. Our first response is that we are unable to understand how the dissenter knows that Valentine was in fact unlawfully arrested. As we noted above, that issue was not presented to the trial judge or the jury. The jury did, however, determine, after listening to Valentine's testimony and the testimony of the police, that Valentine's physical altercation with the police was not justifiable as self-defense. Unfortunately, the dissent has chosen to second-guess the jury's determination and substitute its own opinion of what occurred.
More importantly, if the rule were, as the dissent suggests it should be, that a person being unlawfully arrested may always resist such an arrest with force, we would be inviting anarchy. While we do not, as the dissent appears to suggest, condone the unlawful use of state force, we can take note of the fact that in the often heated confrontation between a police officer and an arrestee, the lawfulness of the arrest may be debatable. To endorse resistance by persons who are being arrested by an officer of the law, based simply on the arrested person's belief that the arrest is unlawful, is to encourage violence that could, and most likely would, result in harm to the arresting officer, the defendant, or both. In our opinion, the better place to address the question of the lawfulness of an arrest that does not pose harm to the arrested person is in court and not on the street.

II
Valentine's final contention is that this court should dismiss the charge against him on the grounds that the conduct of the arresting officer was so outrageous as to be violative of his right to due process as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution. Significantly, this issue was not raised at the trial court or at the Court of Appeals by Valentine. It was first identified as an issue in Valentine's petition for review, no doubt precipitated by the opinion of the dissenting judge at the Court of Appeals who wrote: "My review of the record leaves me with a deep and abiding certainty that the State violated constitutional principles of fundamental fairness by convicting Mr. Valentine *1305 for a crime which it provoked." State v. Valentine, 75 Wash.App. 611, 621, 879 P.2d 313 (1994) (Schultheis, J., dissenting).[14]
The United States Supreme Court has indicated that there may be situations where "the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction." United States v. Russell, 411 U.S. 423, 431-32, 93 S.Ct. 1637, 1643, 36 L.Ed.2d 366 (1973). To be violative of due process, the officer's conduct must, however, shock the universal sense of fairness. Russell, 411 U.S. at 432, 93 S.Ct. at 1643.
This court has also indicated that the state's conduct might be so inappropriate as to be violative of due process, but we cautioned that it would have to rise to the level that it was "`so shocking as to violate fundamental fairness.'" State v. Myers, 102 Wash.2d 548, 551, 689 P.2d 38 (1984) (quoting State v. Smith, 93 Wash.2d 329, 351, 610 P.2d 869, cert. denied, 449 U.S. 873, 101 S.Ct. 213, 66 L.Ed.2d 93 (1980)). Prior to our recent decision in State v. Lively, 130 Wash.2d 1, 921 P.2d 1035 (1996), however, "no Washington decision ha[d] dismissed a prosecution for outrageous conduct by government agents." State v. Rundquist, 79 Wash.App. 786, 794, 905 P.2d 922 (1995), review denied, 129 Wash.2d 1003, 914 P.2d 66 (1996). In Lively, we concluded that the conduct of the police was so "contrary to public policy and to basic principles of human decency" as to be violative of due process. Lively, 130 Wash.2d at 27, 921 P.2d 1035. Consequently, we reversed the defendant's (Lively's) conviction.
The situation here is not at all like that which was confronted in Lively. That is so because the record we have been furnished does not permit us to reach a determination that the police acted in such an outrageous manner that due process considerations dictate dismissal of the charge against Valentine. In order to do so, we would have to accord greater weight to the testimony of Valentine than to the Spokane police officers. Although the dissenting opinion describes the disputed facts in the light most favorable to Valentine, it was appropriate for the author of the dissent to do so in the context of exploring the issue of whether Valentine was entitled to have the trial court instruct the jury that a person may use force to resist an unlawful arrest. Thompson v. Berta Enters., Inc., 72 Wash.App. 531, 864 P.2d 983 (a party has the right to have his or her theory of the case presented to the jury if there is substantial evidence to support it), review denied, 124 Wash.2d 1028, 883 P.2d 327 (1994). On the other hand, whether a prosecution should be dismissed for outrageous conduct is a different question. At this level, that question should be viewed as a question of law that is to be based on the facts of the case. Those facts, however, are not to be resolved at the appellate court, nor should we view them in the light most favorable to the defendant. Resolution of factual disputes is a task for the trier of fact, not this court. Lillig v. Becton-Dickinson, 105 Wash.2d 653, 657, 717 P.2d 1371 (1986).
Unfortunately, the trial court was not asked to make findings of fact on this issue.[15] Although Valentine and the Spokane police officers all testified about the incident, the officers' version of the event varied greatly from Valentine's version. Importantly, although the jury was not asked to consider what Valentine now claims is outrageous conduct by the Spokane police officers, it did find Valentine guilty of assaulting Moore. In reaching that determination, the jury apparently chose to believe the testimony of the *1306 police officers. We will not second guess that determination, particularly where, as here, there has been no challenge to the sufficiency of the evidence supporting the jury's verdict.
In denying Valentine's request for dismissal, we are not saying that the Spokane police officers were not to some degree responsible for escalating a simple traffic stop into a more serious incident. Indeed, there is much here that causes us concern. For instance, why did Officer Robinson consider Valentine to be suspicious? Why, also, was Valentine not presented with a citation to sign before Officer Moore informed him that he would be arrested for failing to cooperate by not signing a citation? Finally, why did so many officers respond to a report of a minor traffic offense occurring in downtown Spokane at midday? Despite these concerns, in the absence of findings of fact or undisputed facts showing outrageous conduct by the Spokane police officers, we cannot say that their conduct was violative of due process. Consequently, we are unwilling to direct dismissal of the third degree assault charge against Valentine.
Affirmed.
DURHAM, C.J., and DOLLIVER, GUY, JOHNSON and TALMADGE, JJ., concur.
SMITH, Justice, concurring.
I concur in the opinion of the majority because it is based upon the narrow issue of an appropriate instruction on the use of force to prevent an unlawful arrest. I am not fully convinced of the conclusion reached on the issue of outrageous conduct, but I also recognize that issue was not raised by Petitioner Valentine at trial or before the Court of Appeals, and that it was first identified by the dissenting judge in the Court of Appeals.
We are committed in appellate courts to following established rules of procedure and law. This sometimes results in "blinders" which obscure the reality of circumstances in cases before us. This is one such case.
It is my hope that this case will not provide law enforcement officers a license to target a person as a "suspicious subject" merely because the person is standing on a street corner at midday "wearing a black coat," to observe the person drive away in an automobile and follow the automobile until a turn signal violation occurs, to then stop the person, with participation of at least four police officers, and to engage in a course of conduct which results in subduing, tackling and handcuffing the person whose obstreperous response to this confrontation then results in trial and conviction for third degree assault against a police officer engaged in performance of official duties.
Under the undisputed facts of this case, Petitioner Valentine did nothing to justify characterizing him as a "suspicious subject" except being an African American male person standing on a street corner in Spokane at midday. The law in all its majesty requires something more than that.
MADSEN, Justice, concurrence in the dissent.
I concur with Justice Sanders' discussion of the law in Washington and the principle of stare decisis. Dissent at 1306-21.
I would reverse and remand for a new trial with proper instructions.
SANDERS, Justice, dissenting.
Ronald Valentine was brutally beaten during the course of an unlawful arrest for a minor traffic infraction. Now this court affirms the criminal conviction of the victim despite the common law rule which clearly provides Valentine a viable legal defense. Mr. Valentine would not give up his liberty without a fight. Neither should we.
This dissent is worth the fight because a great and fundamental principle is at stake. The majority retraces this principle 300 years to The Queen v. Tooley, 2 Ld.Raym. 1296, 92 Eng.Rep. 349, 353 (William Green & Sons 1909) (K.B.1710). Majority at 1299. Then-Chief Justice Holt recognized false arrest and imprisonment are offenses against the Magna Charta itself. The Queen v. Tooley, 92 Eng.Rep. at 353 ("But sure a man ought to be concerned for Magna Charta and the law; and if anyone against the law imprisons a man, he is an offender against the Magna Charta."). The Magna Charta is the earliest and perhaps greatest statement of English-speaking people that even the King is not a law unto himself. Providence help us if the majority is correct that such a *1307 "theoretical footing" has "eroded with the passage of time." Majority at 1298.
By way of introduction, let us review the claims of the majority in the context of my proposed rejoinder.
The facts as recounted by the majority are bad enough, yet understated. Even so they depict a bone-chilling, brutal, and nearly lethal beating of a fellow citizen for a minor traffic violation. But I would rejoin, to sustain a criminal conviction of the victim who was denied an instruction which simply would have allowed the jury to consider his defense is yet a greater outrage. Such refusal of the proposed jury instruction not only excuses the true offense perpetrated upon the victim but generalizes the wrong to all of us through its ill-conceived precedent.
The majority faults Valentine for allegedly not claiming his arrest was unlawful, asserting he did not properly preserve the issue by neglecting to raise it either at trial or before the Court of Appeals. Majority at 1296; 1294 n. 1. To the contrary, Valentine did argue unlawful arrest both at trial court and before the Court of Appeals. At trial his counsel argued for instruction 9, which applies only if the jury finds Valentine was unlawfully arrested. See Report of Proceedings (RP) at 264-65. The instructions elsewhere defined an unlawful arrest. Clerk's Papers (CP) at 69. Before the Court of Appeals Valentine argued the arrest was unlawful and that under Rousseau Valentine should have been able to forcefully resist. See Br. of Appellant at 23. The Court of Appeals recognized, "In his defense, Mr. Valentine... insisted he used reasonable force to protect himself from an illegal arrest." State v. Valentine, 75 Wash.App. 611, 615, 879 P.2d 313 (1994). What more we can expect of this man I do not know.
The majority claims the common law rule which privileges one to resist an unlawful arrest by reasonable force is unclear and/or confused. Majority at 1297. But when push comes to shove, the majority admits the rule exactly as Valentine had posited it in his refused instruction (Majority at 1297-98) and then proceeds to expressly overrule a case upon which Valentine justifiably relies. Majority at 1304 ("We explicitly overrule Rousseau [40 Wash.2d 92, 241 P.2d 447 (1952) ] and other cases that are inconsistent with our holding in this case.").
Claiming a new-found enlightenment not apparent to legal generations which preceded it, the majority then opines that the established common law rule has outlived its usefulness in our brave new world where resistance to unlawful infliction of state coercive power is not only futile (Majority at 1302-03), but also invites "anarchy." Majority at 1304. Apparently the majority believes the unlawful use of state force is not anarchy but order. Yet I suggest such circumstances are not new, nor is the seeming futility of individual resistance to the over whelming, yet still unlawful, police power of the state. It is an age-old tale. Mr. Valentine does not need courts to tell him who is going to win a physical confrontation with the police. But he does need this court to recognize and protect his legal rights.
Ultimately the majority's rule forbidding lawful resistance to unlawful state conduct specially privileges government agents in the wrong to the prejudice of citizens in the right. This special privilege is established notwithstanding the unquestioned and continuing right of a citizen to forcibly resist an assault against his person or a trespass on his property if committed by a private citizen. Thus, in a society of equals, those who violate their public trust by stepping beyond the boundaries of their lawful authority are privileged to become the usurping masters of the public they were originally entrusted to serve. Compare, e.g., State v. Williams, 81 Wash.App. 738, 743-44, 916 P.2d 445 (1996) (one who is assaulted in a place he has a right to be has no duty to retreat and has a right to respond with force no matter how reasonable flight may be).
Finally, I offer my condolences to a majority which makes a criminal out of a victim under a circumstance which "causes [it] concern." Majority at 1306. The concurrence *1308 appears to appreciate exactly what is afoot[1] but still will deny Mr. Valentine the benefit of his legal defense.
To focus precisely on the issue, we consider Mr. Valentine's claim that he properly exercised his constitutional right by demanding the state prove beyond a reasonable doubt, to a jury of his peers, that he had criminally assaulted a police officer. It was Valentine's theory that his use of force, under all the circumstances, was but a reasonable response to an unlawful arrest. He sought to tender both the reasonableness of his force and the unlawfulness of his arrest to his peers for their consideration. To that end his trial counsel requested the jury be instructed:
A person arrested without lawful authority may forcibly resist that arrest so long as the force is no more than is necessary as defined elsewhere in these instructions.[2]
CP at 43. Had the court given this instruction Valentine could have argued his theory that the arrest was unlawful, and his force was reasonable; however, the trial court refused the proposed instruction, rather instructing the jury:
A person unlawfully arrested by an officer may resist the arrest; the means used to resist an unlawful arrest must be reasonable and proportioned to the injury attempted upon the party sought to be arrested. The use of force to prevent an unlawful arrest which threatens only a loss of freedom, if you so find, is not reasonable.

RP (3/6/92) at 278 (emphasis added).
The issue in substance, therefore, is whether the final sentence of the court's instruction accurately states the law. Without question a criminal defendant enjoys the right to have the jury accurately instructed on his theory of defense, provided the instruction is supported by substantial evidence and accurately states the law. And it is reversible error to refuse it. State v. Ager, 128 Wash.2d 85, 93, 904 P.2d 715 (1995).
For the reasons which follow I would hold that Valentine's proposed instruction, not the court's, accurately states the law and that as a matter of great principle, as if prudence and legal necessity do not suffice, the rule of law which recognizes a citizen's right to use reasonable force to resist an unlawful arrest should not be lightly cast aside but held tightly to the breast within which beats liberty's very heart.

Valentine's Facts
Whether this arrest was indeed unlawful under every construction of the facts we need not determine, nor need we decide whether the facts as related by Valentine truly describe the incident. These are questions which the jury should have decidedbut were improperly withheld.
Ronald Valentine presented his version of the facts to the jury. He claimed the police had a personal vendetta against him, spotted him, sent half a dozen officers after him, harassed him, provoked him, and then beat him unconscious.
Valentine's evidence shows the Spokane police knew him from prior encounters. They had cited him twice for license plate violations, the second occurrence only four *1309 days prior to this incident. The night before his arrest Officer Yates and two other officers exchanged words with Valentine in a local tavern. Valentine testified the officers told him he had a bad attitude and then said, "We are going to get you." RP (3/5/92) at 186.
The officers then discussed Valentine the next morning at roll call. Later that same day police spotted him on a street corner "looking suspicious" and began trailing him as he entered his car and drove away. The police initially followed with two squad cars and a motorcycle, but by the time they pulled him over for failing to signal, several more officers had arrived. According to oral argument the entire downtown police force was in attendance.
When Valentine said he was tired of the harassment, which he attributed in part to his race,[3] Officer Moore purportedly responded "We've got a place for your people, you know. It's downtown." RP (3/5/92) at 192. According to Valentine, without first being afforded an opportunity to sign a traffic infraction citation for a defective turn signal (because one had not been written), the officer told him he would be arrested and his car impounded. Not only is it uncontroverted that no ticket had been written, but the officers showed no intention to write one. The officers never began to write a ticket nor did they produce the customary ticket book upon which a ticket could have been written had they so intended. RP (3/4/92) at 64. Even so, according to the testimony of Officer Jones, Valentine was still calm and cooperating to this point. RP (3/5/92) at 174.
Valentine testified that as he was closing the window of his car to secure it he heard Moore say to Robinson, "Let's get him now." RP (3/5/92) at 194. Officer Robinson testified that he focused on Valentine's arms, twisting them behind his back while wrenching the thumb to the wrist. Moore simultaneously rushed Valentine and cracked him in the face with a police radio, splintering Valentine's glasses and breaking the radio. According to Valentine's testimony, he was not only arrested but was physically battered before he hit Moore. Officer Yates, who had exchanged words with Valentine in the tavern, came from behind and slammed Valentine's head into Valentine's car. Officers Jones and Webb joined in. One requested handcuffs, to which Yates reportedly responded: "Don't worry about the cuffs because we're going to kill him." RP (3/5/92) at 197. Webb worked on twisting Valentine's other arm behind his back while Yates was applying an artery chokehold which renders the victim unconscious if "applied correctly." Majority op. at 1296 n. 4. If not "applied correctly," the hold can be fatal.[4]
When Valentine arrived at jail, the jail nurse supervisor refused to admit him because of his injuries but rather ordered him delivered to a hospital emergency room for treatment. After Valentine came around during his four-hour emergency room stay, Officer Moore wrote up and presented the ticket to him for the first timewhereupon Valentine signed the ticket immediately. RP (3/4/92) at 71. Valentine was then charged with third degree assault. He was never charged with refusing to sign the infraction. CP at 1.
*1310 At his trial for assaulting an officer, Valentine asked that the jury be allowed to decide whether striking this officer was a reasonable response to this illegal arrest However, the trial court held, and the majority today agrees, the use of any force whatsoever to resist an unlawful arrest is in itself a criminal act. The effect of this rule is to make irrelevant whether the arrest was unlawful, a prospect which neither the majority nor the Spokane municipal authorities seem particularly intent to address.
I posit this arrest was indeed unlawful because in Washington one may not be arrested for an ordinary traffic infraction. RCW 46.63.020. However, failure to sign an infraction constitutes a misdemeanor (RCW 46.61.021(3), .022) for which arrest is permitted. RCW 10.31.100(1). Yet Valentine was never charged with failure to sign; nor was he even presented a ticket to sign before his arrest. I can find no lawful basis to arrest this man prior to initiation of physical contact by the police, and the majority apparently cannot either.

Historical Right to Resist Unlawful Arrest
The right to be free from unlawful arrest dates back to the Magna Charta and perhaps before. See Magna Charta, § 39 ("No free man shall be seized or imprisoned ... except by the law of the land."). Unlawful arrest has always been considered a serious affront. See The Queen v. Tooley, 2 Ld. Raym. 1296, 92 Eng.Rep. 349, 353 (William Green & Sons 1909) (K.B.1710) ("if anyone against the law imprison a man, he is an offender against Magna Charta.").[5] The law has, from the start, deemed an unlawful arrest an assault and battery. State v. Rousseau, 40 Wash.2d 92, 95, 241 P.2d 447 (1952). (`"An illegal arrest is an assault and battery,'") (citing State v. Robinson, 145 Me. 77, 72 A.2d 260, 262 (1950)).
Because this is so, the common law recognized the victim's legal right to forcibly resist. "[B]oth American and English courts reached the same conclusions concerning the right to resist an unlawful arrest: an assertion of arbitrary authority was a provocation to resist." Chevigny, The Right to Resist an Unlawful Arrest, 78 Yale Law J. 1128, 1132 (1969). The right was recognized long ago as common citizens came to understand they had rights of personal liberty against lords, Crown, and state. Id. at 1137-38. This right to resist unlawful arrest "memorializes one of the principle elements in the heritage of the English revolution: the belief that the will to resist arbitrary authority in a reasonable way is valuable and ought not to be suppressed by the criminal law." Id. see also L.B. Horrigan & Seymour D. Thompson, Select American Cases on the Law of Self-Defence 716 (1874) ("[T]he law sets such a high value upon the liberty of the citizen, that an attempt to arrest him unlawfully is esteemed a great provocation....").
Authority is clear, as are these cases on their face, the principle upon which the rule was founded that an individual may resist an unlawful arrest with reasonable force is rooted in political philosophy and is no way dependent upon a trivial factual inquiry into the conditions of one's local jail. Compare Majority at 1300-01. Certainly we have repeated the rule in our jurisdiction in recent years when our jails were much the same as today.
The majority's discussion under the heading "English Prisons" (Majority at 1300-01) *1311 trivializes and denies by omission the great principle so aptly summarized in the Declaration of Independence that governments derive their just powers from the consent of the governed and that the purpose of government is to protect legal rights, not to violate them through lawless conduct. This principle remains the same whether the local jail is a damp and frigid dungeon or a country club with a fence around it. In either case the inmate has lost his liberty and the government has violated the law when it stole it from him.[6]
In America the tradition of resisting unlawful authority has been embraced from the early days of resisting imperial British power during the Revolution through the civil rights movement. See Wright v. State of Georgia, 373 U.S. 284, 83 S.Ct. 1240, 10 L.Ed.2d 349 (1963) (reversing conviction of a group of African-Americans for refusing to obey an order to leave a segregated basketball court). It is fundamental.
"In the face of obvious injustice, one ought not to be forced to submit and swallow one's sense of justice. More importantly, it is unconscionable to convict a man for resisting an injustice. This is indeed a value judgment, but the values are fundamental." Chevigny, supra at 1137-38. Common law acknowledges a reasonable amount of force can be used to repel the assault and battery of an illegal arrest, including that which threatens one's liberty without physical injury. Indeed, allowing resistance without allowing any force renders the right to resist hollow and illusory. In 1900 the United States Supreme Court held "If the officer had no right to arrest, the other party might resist the illegal attempt to arrest him, using no more force than was absolutely necessary to repel the assault constituting the attempt to arrest." John Bad Elk v. United States, 177 U.S. 529, 535, 20 S.Ct. 729, 731, 44 L.Ed. 874 (1900).
Traditionally, illegal, arbitrary abuse of state power has been regarded as even more threatening and deserving of resistance than the occasional street crime. Thus the common law has long held "[I]f one be imprisoned upon an unlawful authority, it is a sufficient provocation to all people out of compassion; much more where it is done under a colour of justice ...." The Queen v. Tooley, 2 Ld.Raym. 1296, 92 Eng. Rep. at 352 (emphasis added). Justice Brandeis said much the same:
The maxim of unclean hands comes from courts of equity. But the principle prevails also in courts of law. Its common application is in civil actions between private parties. Where the government is the actor, the reasons for applying it are even more persuasive. Where the remedies invoked are those of the criminal law, the reasons are compelling.
Olmstead v. United States, 277 U.S. 438, 483-84, 48 S.Ct. 564, 574, 72 L.Ed. 944 (1928) (Brandeis, J., dissenting).
Decency, security, and liberty alike demand that government officials shall be subjected to the same rules of conduct that are commands to the citizen. In a government of laws, existence of the government will be imperiled if it fails to observe the law scrupulously. Our government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious. If the government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy. To declare that in the administration of the criminal law the end justifies the meansto declare that the government may commit crimes in order to secure the conviction of a private criminalwould bring terrible retribution. Against that pernicious doctrine this court should resolutely set its face.
Id. at 485, 48 S.Ct. at 575 (Brandeis, J., dissenting).
New York's high court reasoned similarly: "For most people, an illegal arrest is an *1312 outrageous affront and intrusionthe more offensive because under color of lawto be resisted as energetically as a violent assault." People v. Cherry, 307 N.Y. 308, 121 N.E.2d 238, 240 (1954) (emphasis added).
Thomas Paine considered it common sense that
Society in every state is a blessing, but government even in its best state is but a necessary evil; in its worst state an intolerable one; for when we suffer, or are exposed to the same miseries by a government, which we might expect in a country without government, our calamities is heightened by reflecting that we furnish the means by which we suffer.
Thomas Paine, Common Sense at 65 (Penguin Books 1976) (1776).
Thomas Jefferson's Declaration of Independence reminds us governments are instituted among men to secure the inalienable rights of life, liberty, and the pursuit of happiness, and "[t]hat whenever any Form of Government becomes destructive of these ends, it is the Right of the People to alter or abolish it...." The Declaration of Independence of 1776 at 1 (U.S., July 4, 1776). In support of this Declaration the signers pledged "our Lives, our Fortunes and our sacred Honor." Some lost their lives, many their fortunes, but none their honor. When government agents commit assault and battery against the very citizens they are sworn to protect, the government is no longer our friend; it is our dangerous enemy.
The Government of the State of Washington, as well, was "established to protect and maintain individual rights." Const. art. I, § 1. It was not established to do precisely the opposite.
The age-old rule which recognizes the right to resist unlawful assertions of state power is an important deterrent to tyranny. With the rule limited to cases where the police are exceeding and abusing their authority, the police officers involved in the excess should be deterred, knowing that their abuse may spark resistance.
This rule has equal application in the twentieth and twenty-first centuries to the extent it is rooted in political theory and human nature. In a well-known passage in The Gulag Archipelago, at 13 n. 5 (English ed. 1973), Aleksandr Solzhenitsyn wonders what would have happened had the countless victims of Stalin's arbitrary state power resisted and whether the officers serving under Stalin might have acted with less zeal had they known they could face legitimate resistance and even harm in effectuating their unlawful arrests. Solzhenitsyn suggests that resistance would have been an effective deterrent; had the victims resisted, "notwithstanding all of Stalin's thirst, the cursed machine would have ground to a halt!" Id. He then concludes that "resistance should have begun right there, at the moment of the arrest itself." Id. at 15. What, then, would Solzhenitsyn make of the majority's claim that this rule has outlived its usefulness because resistance to unlawful arrest when perpetrated by American authority is an act of futility, as the power of our state is so omnipotent that resistance is not only futile but should be condemned? Majority at 1302-03.
It may be true, as the majority posits, those who resist an unlawful arrest, like Valentine, will often be the worse for it physically; however, that is not to say that their resistance is unlawful. The police power of the state is not measured by how hard the officer can wield his baton but rather by the rule of law. Yet by fashioning the rule as it has, the majority legally privileges the aggressor while insulting the victim with a criminal conviction for justifiable resistance.

Unlawful Arrest in Practice
Modern judicial decisions have adopted procedures to deter unlawful search and seizure (see Mapp v. Ohio, 367 U.S. 643, 655, 81 S.Ct. 1684, 1691-92, 6 L.Ed.2d 1081, 84 A.L.R.2d 933 (1961) (adopting the exclusionary rule to curb illegal police conduct in making unwarranted and unreasonable searches and seizures)) as well as to deter police conduct which induced innocent men to commit crimes. See State v. Smith, 101 *1313 Wash.2d 36, 42, 677 P.2d 100 (1984) ("Entrapment occurs only when ... the accused is lured or induced into committing a crime he had no intention of committing."). Also see Chevigny, The Right to Resist an Unlawful Arrest, supra at 1149 ("Policemen sometimes threaten to `get' a defendant.... If the arrest is unlawful, a personal element makes it doubly provocative, and suggests that the police may have entrapped the resisting defendant into a crime he would not otherwise have committed.").
Allowing police to arrest wrongfully and then prosecute the victim for righteous resistance is wrong for the same reason entrapment is wrong. It was only the injustice of the police misconduct that induced the outraged victim to resist.
Judge Schultheis of the Court of Appeals, Division Three, characterized such behavior as outrageous police misconduct and in possible violation of the due process clause of the Fourteenth Amendment so as to shock the judicial conscience. State v. Valentine, 75 Wash.App. 611, 625, 879 P.2d 313 (1994) (Schultheis, J., dissenting), review granted, 128 Wash.2d 1001, 907 P.2d 298 (1995); see also State v. Lively, 130 Wash.2d 1, 921 P.2d 1035, 1044-49 (1996). However, as the majority opinion here attests, the conscience of many jurists is not easily shocked. Many courts have set the bar so high that only giants may leap to state a due process claim based on outrageous police misconduct, which "`is not established merely upon a showing of ... even flagrant misconduct on the part of the police....'" State v. Myers, 102 Wash.2d 548, 551, 689 P.2d 38 (1984) (quoting United States v. Kelly, 707 F.2d 1460 (D.C.Cir., 1983) (emphasis added)).
No published Washington opinion, save State v. Lively, 130 Wash.2d 1, 921 P.2d 1035, 1044-49 (1996), ever overturned a conviction on this ground because it must be "shocking to the universal sense of justice." Lively, 921 P.2d at 1049 (Durham, C. J., dissenting) (quoting United States v. Russell, 411 U.S. 423, 432, 93 S.Ct. 1637, 1643, 36 L.Ed.2d 366 (1973)).
Therefore I would prefer the more direct route of reliance upon common law precedent than to rest my analysis on an appeal to judicial conscience, which seems quite resilient at times.
At oral argument the city admitted its officers would repeat the same conduct "if this kind of factual circumstance ever arose again." Oral argument (3/27/96) tape 1. There is no acknowledgment of wrongdoing, let alone remorse. And the majority provides no incentive for contrition.
Nevertheless, the majority suggests victims of illegal arrest should not be allowed to resist by physical force because their rights can be "`Vindicated through legal processes.' "Majority op. at 1297 (citation omitted). But this claim misses the mark: the rights of the victim have already been violated by the illegal arrest. The remaining question is whether the victim who instinctively resists the injustice is to be doubly wronged by suffering the second indignity of a criminal conviction.
If "Vindication" means the alleged police aggressor is subject to even-handed prosecution (not just his victim), I hear the applause of one hand clapping. At oral argument the state admitted that not even internal disciplinary action had been taken against these officers and none is "appropriate." Oral argument (3/27/96) tape 1. Moreover, in practice the victim of a wrongful arrest may sue for damages; however, usually he cannot afford an attorney while, inevitably, the government wrongdoer is provided a full defenseat taxpayer expense.
While criminal prosecution of those resisting arrest is common, prosecution of officers abusing their authority is rare. The police department itself does the preliminary investigation of possible abuse and usually the case will not go forward unless the department so recommends. See Alison L. Patton, Note, The Endless Cycle of Abuse: Why 42 U.S.C. § 1983 is Ineffective in Deterring Police Brutality, 44 Hastings L.J. 753, 787 (1993) ("The [internal investigative] division is located within the police departmentthe *1314 investigators are police officers, and the entire process is concealed from the public.") A recent study reveals "of all alleged instances of police misconduct, prosecution occurred in only one quarter of 1% of the cases." Laurie L. Levenson, The Future of State and Federal Civil Rights Prosecutions: The Lessons of the Rodney King Trial, 41 UCLA L.Rev. 509, 535 (1994). Additionally, in the very few cases actually prosecuted, the fact that the police themselves conducted the initial investigation coupled with the "code of silence" often renders effective prosecution impossible.
Here Officer Yates conducted the internal investigation. RP (3/5/92) at 146. Yates was the same officer who had words with Valentine the night before; the one who reportedly said, "We're going to get you"; the one who applied the carotid hold which rendered Valentine unconscious before he went to the emergency room; and the one who told other officers, "we're going to kill him." RP (3/5/92) at 197. And the same prosecutor who would defend the government in a civil suit has little incentive, if not an outright conflict, to pursue criminal remedies against a wrongdoer who is employed by the client who must bear ultimate financial responsibility. The majority should not hold its breath until we see the light at the bottom of the hole it has dug.

The Law in Washington
The majority recognizes that State v. Rousseau, 40 Wash.2d 92, 241 P.2d 447 (1952) holds one faced with illegal arrest may resist with reasonable force. But to apply the rule we must carefully distinguish between arrests which are lawful and those which are not, and distinguish between resistance through force which is reasonable and force which is unreasonable. In our state, and elsewhere, one has no right to use any force to resist a lawful arrest, and one has no right to use unreasonable force to resist even an unlawful one.
Washington incorporated this common law into territorial law in 1881 by statute, and upon statehood territorial law became law of the state. Code of 1881, § 1; Const. art. XXVII, § 2. See also RCW 4.04.010 ("The common law ... shall be the rule of decision in all the courts of this state.") (emphasis added). "Shall" is imperative. State v. Krall, 125 Wash.2d 146, 148, 881 P.2d 1040 (1994). The incorporated common law on the right to resist illegal arrest is clear: "The law is well settled that reasonable means including physical force may be used to resist an illegal arrest.... This rule of law is based on the principle that an illegal arrest is an assault and battery, and one so arrested may either turn and walk away or match force with force...." Curtis v. United States, 222 A.2d 840, 842 (D.C.App.1966) (citations omitted). Since the beginning our state has subscribed to this rule. See State v. Symes, 20 Wash. 484, 490, 55 P. 626 (1899) ("`If one, even an officer, undertakes to arrest another unlawfully, the latter may resist him.'") (citing 1 Bishop, Criminal Law § 868). I can find no case (aside from the majority opinion here) which overrules this line of authority. Compare WPIC 120.06, Resisting ArrestsElements (a prima facie case requires the prosecution to prove beyond a reasonable doubt "that the arrest or attempt to arrest was lawful.").
I accept the majority's claim that our leading modern authority on this issue is State v. Rousseau, 40 Wash.2d 92, 241 P.2d 447 (1952). Rousseau has been cited and relied upon in numerous cases preceding this. I submit it summarizes a rule of law upon which Mr. Valentine is entitled to rely in the present and which should not be lightly cast aside for the future.
The facts of Rousseau are these: Mr. Rousseau was unlawfully arrested without probable cause for a second degree burglary on a Seattle street corner. Although the arrest was effected in a completely nonviolent way, and he was not even handcuffed, Rousseau pushed the arresting officer into the path of an approaching automobile which, according to this court, "could have seriously injured or killed the officer as effectively as though the appellant had used a gun, a knife, *1315 or other deadly weapon...." Id. at 95, 241 P.2d 447.
Fortunately, however, the officer was not injured but instead pursued Rousseau in earnest, arresting him on the second occasion for assaulting an officer in the context of the earlier arrest. The issue presented to the Supreme Court was whether the second arrest was also illegal since it arose from Rousseau's use of force to resist the first arrest.
Considering the question on appeal, the Supreme Court announced the governing rule of law:
It is the law that a person illegally arrested by an officer may resist that arrest, even to the extent of the taking of life if his own life or any great bodily harm is threatened.
Rousseau, 40 Wash.2d at 94, 241 P.2d 447 (citing John Bad Elk v. United States, 177 U.S. 529, 535, 20 S.Ct. 729, 731, 44 L.Ed. 874 (1900) and State v. Gum, 68 W.Va. 105, 69 S.E. 463, 33 L.R.A.N.S. 150 (1910)). In so holding, the Supreme Court specifically rejected the claim that "even in the case of an unlawful arrest, the person arrested would be warranted in using force and inflicting personal injury upon the officer only in selfdefense, the necessity or apparent necessity for which must appear." 40 Wash.2d at 95, 241 P.2d 447. Rather, the Rousseau majority adhered to John Bad Elk, Gum, and State v. Robinson, 145 Me. 77, 72 A.2d 260, 262 (1950), which
laid down the rule that the force used in resisting an unlawful arrest must be reasonable and proportioned to the injury attempted upon the party sought to be arrested, and he cannot use or offer to use a deadly weapon if he has no reason to apprehend a greater injury than a mere unlawful arrest.
Rousseau, 40 Wash.2d at 95, 241 P.2d 447. Although the Supreme Court concluded that Rousseau's first arrest was unlawful, it also concluded that the degree of force used by Rousseau to resist that unlawful arrest may have been unlawfully excessive, which "is usually a question for the jury under all the circumstances." Id. at 96, 241 P.2d 447 (emphasis added).
Had the trial court in Mr. Valentine's case followed the dictates of Rousseau, it would have given the jury instruction proposed by Valentine, thereby allowing the jury to determine whether or not Valentine used "unreasonable force in resisting arrest." Id. Our courts followed the common law rule as expressed in Rousseau in 1952 for at least another 30 years.
For example, in City of Kennewick v. Keller, 11 Wash.App. 777, 787, 525 P.2d 267 (1974) the illegally arrested defendant, faced with loss of liberty "alone," resisted the unlawful arrest by jerking free of the officer's grasp and then hitting the officer. The Court of Appeals reversed the trial court's conviction for resisting arrest, reasoning that one has the lawful right to use reasonable force to resist an unlawful arrest. The court cited Rousseau for the proposition that "[a] citizen has the right to resist an unlawful arrest so long as that resistance is reasonable in light of all the circumstances." Id. at 787, 525 P.2d 267.
Also following the common law rule was State v. Counts, 99 Wash.2d 54, 659 P.2d 1087 (1983), in which a man illegally arrested and facing "nothing more" than loss of liberty threatened the arresting officers with a butcher's knife. In reversing defendant's conviction for assaulting the officers, this court cited Rousseau and remanded for new trial which "should include an instruction to the jury on a defendant's right to use reasonable resistance against an unlawful arrest." Counts, 99 Wash.2d at 61, 659 P.2d 1087.
The same rule was applied again in State v. Hoffman, 35 Wash.App. 13, 664 P.2d 1259 (1983), in which the police perpetrated an unlawful arrest. During the unlawful arrest the defendant pulled away from the officer, swung at him and a scuffle ensued. The defendant faced "only" a loss of liberty, yet the court acknowledged his right to resist. "We recognize that the defendant had a right to defend himself against an unlawful arrest."
*1316 Hoffman, 35 Wash.App. at 17, 664 P.2d 1259 (citing Counts, 99 Wash.2d 54, 659 P.2d 1087, and City of Kennewick, 11 Wash.App. 777, 525 P.2d 267). "Whether he used reasonable force under the circumstances is, however, a question for the jury." Hoffman, 35 Wash. App. at 17, 664 P.2d 1259 (citing Rousseau, 40 Wash.2d 92, 241 P.2d 447).
State v. Johnson, 29 Wash.App. 307, 309, 628 P.2d 479 (1981) is in accord: "[A] citizen [has] the right to resist an unlawful arrest so long as that resistance is reasonable in light of all the circumstances ...." (citing City of Kennewick, 11 Wash.App. at 787, 525 P.2d 267).
In State v. Humphries, 21 Wash.App. 405, 586 P.2d 130 (1978) the police unlawfully entered a dwelling and the defendant struck the officer. On appeal the court noted that "[a] person illegally arrested by an officer may resist that arrest; the force used in resisting an unlawful arrest must be reasonable and proportioned to the injury attempted on the party sought to be arrested." Id. at 407-08, 586 P.2d 130 (citing Rousseau, 40 Wash.2d 92, 241 P.2d 447 and City of Kennewick, 11 Wash.App. at 787, 525 P.2d 267).
Despite all of this precedent, none of which has ever been overruled, and despite the clarity of the rule, the great principle of a person's right to resist unlawful arrest has become tarnished, if not obscured, by dicta thoughtlessly conceived by courts demonstrating little or no recognition of the importance of the issue.
For example, State v. Hornaday, 105 Wash.2d 120, 131, 713 P.2d 71 (1986), superseded by statute as stated in State v. Preston, 66 Wash.App. 494, 832 P.2d 513 (1992), allowed dictum to the effect that "`[t]he use of force to prevent even an unlawful arrest which threatens only a loss of freedom is not reasonable.'" (quoting State v. Goree, 36 Wash.App. 205, 209, 673, P.2d 194 (1983), review denied, 101 Wash.2d 1003 (1984)). This was dictum because the arrestee used no force and was convicted only of being uncooperative in resisting arrest, not of assaulting an officer. Further, the court found the defendant's response reasonable and reversed his conviction.
Such ill-considered dictum from Hornaday was essentially repeated in State v. Mierz, 127 Wash.2d 460, 901 P.2d 286 (1995), which rejected the defendant's claim that he was denied effective assistance of counsel because his trial counsel did not argue that he was entitled to use "self-defense" in the form of siccing his dogs on law enforcement officers. Id. at 477, 901 P.2d 286. In the context of rejecting the self-defense claim the court stated "[a]n arrestee charged with assault upon a law enforcement officer must show that there was an imminent threat of serious physical harm in connection with an unlawful arrest in order to establish legitimate use of force in self-defense. RCW 9A.16.020(3)...." Mierz, 127 Wash.2d at 476, 901 P.2d 286. But to the contrary, the cited statute recognizes the right to defend against unlawful arrest:
The use, attempt, or offer to use force upon or toward the person of another is not unlawful in the following cases:
. . . .
(3) Whenever used by a party about to be injured, or by another lawfully aiding him or her, in preventing or attempting to prevent an offense against his or her person, or a malicious trespass, or other malicious interference with real or personal property lawfully in his or her possession, in case the force is not more than is necessary....
RCW 9A.16.020 (emphasis added). Thus any claim that Mierz overruled Rousseau "sub silentio" (Majority at 1297) credits this court with an act of thoughtlessness justified by neither the facts nor holding of that decision.
In fact, this statute is perfectly consistent with the jury instruction offered by Valentine because it recognizes his right to prevent an offense against his person "in case the force is not more than is necessary." In any event, the language in Mierz was mere dicta because it was not necessary to the decision in that case. Pedersen v. Klinkert, 56 *1317 Wash.2d 313, 317, 320, 352 P.2d 1025 (1960). Ill-considered dictum should not be transformed into a rule of law. State ex rel. Hoppe v. Meyers, 58 Wash.2d 320, 329, 363 P.2d 121, 100 A.L.R.2d 304 (1961).
Apparently the majority also relies upon ill-considered dictum from the Court of Appeals, although such opinions are not binding upon this court. See, e.g., City of Seattle v. Cadigan, 55 Wash.App. 30, 37, 776 P.2d 727, review denied, 113 Wash.2d 1025, 782 P.2d 1069 (1989) (lawful arrest where the defendant made no assertion that the arrest was unlawful).

Overruling Rousseau Contrary to Stare Decisis
The majority overrules Rousseau without statutory necessity and contrary to the rule of stare decisis.
The majority attacks Rousseau, claiming one of the cases upon which it relied, State v. Gum, 68 W.Va. 105, 69 S.E. 463 (1910), although still good law in itself, nevertheless "relied heavily" on cases from Iowa, California, and Florida, which are no longer controlling in their jurisdictions. Majority at 1298. Although this thread is thin enough, the majority neglects to note these jurisdictions have not, unlike our majority, judicially overruled hundreds of years of common law, but changed the rule by legislation. See Majority at 1302 n. 11. Yet our majority is apparently inclined to legislate from the bench what other courts have left to their legislatures, although our Legislature, to its credit, has resisted the temptation to impose such an innovation.
Under the heading "The Trend Away from the Common Law Rule" (Majority at 1302-04), the majority seems to claim the common law rule should be overruled because now there are 20 states which adhere to it whereas previously there were 45. This rationale is no reason at all. It would be preferable for our state to adhere to an appropriate rule than an inappropriate one, even if we were the only state in the 50 so to do. If anything, the numerical observation of the majority causes one to soberly reflect upon Justice Douglas's metaphor that
As nightfall does not come all at once, neither does oppression. In both instances, there is a twilight when everything remains seemingly unchanged. And it is in such twilight that we all must be most aware of change in the airhowever slightlest we become unwitting victims of the darkness.[7]
Absent legislative intervention "[t]he doctrine [of stare decisis] requires a clear showing that an established rule is incorrect and harmful before it is abandoned." In re Stranger Creek, 77 Wash.2d 649, 653, 466 P.2d 508 (1970).
A thorough discussion of the doctrine of stare decisis by a closely divided Supreme Court in the context of a determined claim that prior precedent be overruled is propounded in Planned Parenthood v. Casey, 505 U.S. 833, 854, 112 S.Ct. 2791, 2808, 120 L.Ed.2d 674 (1992).
The obligation to follow precedent begins with necessity, and a contrary necessity marks its outer limit. With Cardozo, we recognize that no judicial system could do society's work if it eyed each issue afresh in every case that raised it. See B. Cardozo, The Nature of the Judicial Process 149 (1921). Indeed, the very concept of the rule of law underlying our own Constitution requires such continuity over time that a respect for precedent is, by definition, indispensable. See Powell, Stare Decisis and Judicial Restraint, 1991 Journal of Supreme Court History 13, 16. At the other extreme, a different necessity would make itself felt if a prior judicial ruling should come to be seen so clearly as error that its enforcement was for that very reason doomed.
Id. at 854, 112 S.Ct. at 2808.
The right to rely upon fixed standards to determine one's future course of conduct is, *1318 of course, an important consideration supporting the rule. Although I doubt Mr. Valentine spent the evening preceding this incident searching out precedents in his local law library, it is equally apparent that the majority in Casey followed the doctrine in the abortion context more out of a respect for precedent than any illusion that pronouncements of the court would realistically affect the incidence of future pregnancies.[8] Beyond that, Casey clarifies the very heart of stare decisis as a bar to "reexamining the prior law with any justification beyond a present doctrinal disposition to come out differently...." Casey, 505 U.S. at 864, 112 S.Ct. at 2813-14. I see no grounds advanced by the majority today to overrule Rousseau for any reason new or unique to our time. Neither human nature nor the essential aspects of coercive state power have changed much over the centuries, much less over the past 40 years.
Beyond that I would assert the clearly incorrect rule is the one created by the majority today. It does not even examine the true principled basis of the common law rule, much less reasonably, or persuasively, disprove it. At most it misapplies a policy argument made in State v. Westlund, 13 Wash.App. 460, 467, 536 P.2d 20, 77 A.L.R.3d 270, review denied, 85 Wash.2d 1014 (1975), that resisting lawful arrest is disfavored and the courts are the best place to vindicate one's rights. While that is a widely held and commendable view, it has nothing to do with the issue here. Westlund itself suggests that the policy reasons against forcibly resisting lawful arrests are inapplicable to unlawful ones.
Moreover, the rule adopted by the majority is inconsistent with the lawful entitlement to use force to protect one's person and property, or, to put it another way, protect one's property in his person and his estate. It is well established that determinations as to when force may be used in self-defense are not made (as the majority suggests) on the basis of where the right can best be vindicated. Indeed, in this state the citizen has the right to use force to defend property against trespass and invasion. RCW 9A.16.020(3); Coffel v. Clallam County, 58 Wash.App. 517, 524, 794 P.2d 513 (1990).
If one can use force to defend his property, why not use force to defend his person? John Locke, the 17th Century English political philosopher whom Thomas Jefferson acknowledged as the philosophical father and guiding spirit of the American Revolution,[9] recognized a person's property in his person is foremost among his rights to property. John Locke, Second Treatise on Government, in 35 Great Books of the Western World 30 (R. Hutchins ed., 1952). And James Madison agreed one has a property interest not only in "his land, or merchandise, or money," but also in "the safety and liberty of his person...." James Madison, Essay on Property for the National Gazette (Mar. 27, 1792), in 14 The Papers of James Madison 266, 266-68 (Robert A. Rutland & Thomas A. Maron et al. eds., 1983). The majority opinion, therefore, conflicts with RCW 9A.16.020(3) and can be explained more by a political preference for an enlarged government prerogative than by a general and principled rule proven by equal application within the private sector.
Similarly, this state adheres to the "no duty to retreat rule." One who is assaulted in a place he has a right to be has no duty to retreat and has a right to respond with force no matter how reasonable flight may be. State v. Williams, 81 Wash.App. 738, 743-44, 916 P.2d 445 (1996). As the court held just last year, "While the wisdom of such a policy may be open to debate, the policy is one of long standing and reflects the notion that one lawfully where he is entitled to be should not be made to yield and flee by a show of *1319 unlawful force against him." Williams, 81 Wash.App. at 744, 916 P.2d 445 (citing W. LaFave and A. Scott, Jr., Criminal Law § 5.7(f) (2d ed.1986)). Apparently the private violator of another's legal rights may face lawful resistance but the rogue government actor may proceed with comparative impunity.
The majority then contends recognition of the lawful right to forcibly resist an unlawful arrest promotes lawlessness or "anarchy." Majority op. at 1304. But to the extent we distinguish between the rule of law and the rule of men,[10] the majority's purblind stand actually promotes lawlessness, while strict enforcement of the common law right to lawfully resist an unlawful arrest is not anarchy but its prevention. Anarchy is "lawlessness." Black's Law Dictionary 84 (6th ed.1990). And "anarchism is a game at which the police can beat you."[11] An unlawful arrest is the essence of anarchy. "American history is rich in forms of lawlessness, and not all of them stand outside the legal system as enemies of `law and order.' Many, in fact, take place `inside' the legal system itself, or are aspects of that systempolice brutality, for example." Lawrence M. Friedman, Crime and Punishment in American History 172 (1993).[12] The citizen who stands by his legal rights in the face of lawless government misconduct upholds the law and renders a service not only to himself but the public generally.[13] *1320 Many other jurisdictions prefer the common law rule to mandatory abject submission to unlawful arrest.[14] There is no indication these jurisdictions are plagued by "anarchy."

Ex Post Facto Violation
Under Rousseau and the common law Valentine would have been entitled to argue a recognized legal defense, i.e., that his resistance to an alleged unlawful arrest was reasonable even though he faced "only" loss of liberty. However, by overruling Rousseau the court deprives Valentine of this defense and does so retroactivelya clear violation of the prohibition against ex post facto lawmaking.
The expost facto clauses of both the state and federal constitutions prohibit the state from enacting any law which imposes punishment for an act which was not punishable when committed. U.S. Const. art. I, § 10; Const. art. I, § 23; State v. Ward, 123 Wash.2d 488, 496, 869 P.2d 1062 (1994). Ex post facto laws "are contrary to the first principles of the social compact, and to every principle of sound legislation." James Madison, The Federalist No. 44 (1787) in The Federalist Papers by Alexander Hamilton, James Madison, and John Jay at 227 (Bantam Books 1982). In principle "[e]very law that makes an action, done before the passing of the law, and which was innocent clause. Calder v. Bull, 3 U.S. (3 Dall.) 386, 390, 1 L.Ed. 648 (1798) (Chase, J.). This due process principle applies equally to judicial decisions. "[W]here a court overrules a prior decision so as to enlarge the scope of criminal liability, the new rule must be applied prospectively only." State v. Gore, 101 Wash.2d 481, 489, 681 P.2d 227, 39 A.L.R.4th 975 (1984). The rule equally applies when *1321 the new rule deprives a defendant of a previously available defense. Beazell v. Ohio, 269 U.S. 167, 46 S.Ct. 68, 70 L.Ed. 216 (1925) (ex post facto clause prohibits any new law which "deprives one charged with crime of any defense available according to law at the time when the act was committed.").

Conclusion
The majority's rule makes the unlawful arrest of Valentine irrelevant;[15] however, that is the predicate fact which lawfully justifies reasonable resistance and is Valentine's recognized and legitimate defense to the assault charge. Moreover, the majority's new rule is inconsistent with the remainder of Washington law on defense of self and property as well as the fundamental principle upon which it is based. Valentine was absolutely entitled to submit the question of the reasonableness of his response to a false arrest to a jury of his peers.[16]
Apparently the majority thinks it is neither a major injury nor affront to be arrested unlawfully by agents of the government when "only liberty" is at stake. I disagree.
NOTES
[1] In his brief to the appellate court, Valentine assigned error to the trial court's refusal to give his proposed instruction 9, which read:

"A person arrested without lawful authority may forcibly resist that arrest so long as the force is no more than is necessary as defined elsewhere in these instructions." Clerk's Papers at 43. He does not, however, directly refer to that proposed instruction in the body of the brief or in his supplemental brief to this court and thus we have not addressed it.
[2] Moore testified at trial that he was acquainted with Valentine because he had cited him on two prior occasions for front license plate violations.
[3] Yates had been involved in a verbal confrontation with Valentine in a tavern the day before the incident leading to this appeal. Yates testified that the tavern incident "probably could have been" discussed with other officers at roll call, about two hours before the incident. VRP at 138.
[4] The carotid hold is a hold applied to the neck area. It is designed to inhibit the supply of blood to the brain, and when applied correctly, the victim of the hold will lose consciousness.
[5] Cases from the Court of Appeals are consistent with Hornaday. See State v. Crider, 72 Wash. App. 815, 866 P.2d 75 (1994) (holding that reasonable resistance to an unlawful arrest is justified, but use of force to resist an unlawful arrest that threatens only a loss of freedom is not reasonable); City of Seattle v. Cadigan, 55 Wash. App. 30, 776 P.2d 727, review denied, 113 Wash.2d 1025, 782 P.2d 1069 (1989); State v. Goree, 36 Wash.App. 205, 673 P.2d 194 (1983).
[6] State v. Thomas, 262 N.W.2d 607, 611 (Iowa 1978) (overruling prior law and holding" a person may not resist an arrest reasonably effected by one whom the arrestee knows or has good reason to know is a peace officer, despite legality or illegality of the arrest"); "A person is not justified in the use of force to resist an arrest by a law enforcement officer who is known, or reasonably appears, to be a law enforcement officer." FLA. STAT. ch. 776.051 (1995) (statute enacted in 1974); "[I]f a person has knowledge, or by exercise of reasonable care, should have knowledge, that he was being arrested by peace officer, it is duty of such person to refrain from using force or any weapon to resist such arrest." CAL.PENAL CODE § 834a (West 1996) (statute enacted in 1957).
[7] One exception is Rodgers v. State, 280 Md. 406, 373 A.2d 944, cert. denied, 434 U.S. 928, 98 S.Ct. 412, 54 L.Ed.2d 287 (1977).
[8] Today in Washington, the three strangers would have been guilty at least of the gross misdemeanor of obstructing a law enforcement officer: "A person is guilty of obstructing a law enforcement officer if the person willfully hinders, delays, or obstructs any law enforcement officer in the discharge of his or her official powers or duties." RCW 9A.76.020(1). Chief Justice Holt was not deterred by the argument that the second attack of the three strangers, resulting in Dent's death, did not occur until Mistress Dekins was already in prison. He said simply that putting her in prison was "an aggravation." Tooley, 92 Eng.Rep. at 353.
[9] "`Gaol fever,' a highly contagious fatal form of typhus, frequently swept the prisons. It was so pestilential that prisoners brought before the Lent Assize at Taunton (1730) infected the court itselfcausing the deaths of the lord chief baron, the sheriff, the sergeant, and hundreds of others. More prisoners died from `gaol fever' than were put to death by all the public executioners in the realmat a time when there were 241 capital offenses." Ralph D. Smith, Comment, Criminal LawArrestThe Right to Resist Unlawful Arrest, 7 NAT. RESOURCES J. 119, 122 n. 16 (1967) (hereinafter Comment) (citing JOHN HOWARD, THE STATE OF PRISONS 6-7 (1929)) (Howard's observations are from 1773 to 1775).
[10] "[A]ll the complicated horrors of a prison, put an end every year to the life of one in four of those that are shut up from the common comforts of human life.

"Thus perish yearly five thousand men, overborne with sorrow, consumed by famine, or putrified by filth, many of them in the most vigorous and useful part of life." Comment at 123 (quoting The Gentleman's Magazine and Historical Chronicle, Jan. 1759, p. 17).
[11] Ala.Code § 13A-3-28 (1994); Ark.Code Ann. § 5-2-612 (Michie 1993); Cal.Penal Code § 834a (West 1985); Colo.Rev.Stat. § 18-8-103(2) (1990); Conn.Gen.Stat. § 53a-23 (1985); Del.Code Ann. tit. 11, § 464(d) (1995); Fla.Stat. Ann. § 776.051(1) (West 1992); Ill.Ann.Stat. ch. 720, para. 5/7-7 (Smith-Hurd 1993); Iowa Code § 804.12 (West 1994); Mont.Code Ann. § 45-3-108 (1995); Neb.Rev.Stat. § 28-1409(2) (1995); N.H.Rev.Stat.Ann. § 594:5 (1986); N.Y.Penal Law § 35.27 (McKinney 1987) (the dissent's citation of People v. Cherry, 307 N.Y. 308, 121 N.E.2d 238 (1954), is inappropriate, as that case is no longer the law in New York); OR.REV.STAT. § 161.260 (1990); 18 PA.CONS.STAT. ANN. § 505(a), (b)(1)(i) (1983); R.I.GEN.LAWS § 12-7-10 (1994); S.D.CODIFIED LAWS ANN. § 22-11-5 (1988); TEX.PENAL CODE ANN. § 9.31(b)(2), 38.03 (West 1994); VA.CODE ANN. § 18.2-460 (Michie 1996).
[12] Miller v. State, 462 P.2d 421, 427 (Alaska 1969); State v. Hatton, 116 Ariz. 142, 568 P.2d 1040, 1046 (1977); State v. Richardson, 95 Idaho 446, 511 P.2d 263, 268 (1973), cert. denied, 414 U.S. 1163, 94 S.Ct. 928, 39 L.Ed.2d 117 (1974); State v. Thomas, 262 N.W.2d 607, 610-11 (Iowa 1978); State v. Austin, 381 A.2d 652, 655 (Me. 1978); In re Welfare of Burns, 284 N.W.2d 359, 360 (Minn.1979); State v. Nunes, 546 S.W.2d 759, 762 (Mo.Ct.App.1977); State v. Koonce, 89 N.J.Super. 169, 214 A.2d 428, 436 (1965); State v. Doe, 92 N.M. 109, 583 P.2d 473, aff'd in part, rev'd in part, 92 N.M. 100, 583 P.2d 464, 467 (1978); City of Columbus v. Fraley, 41 Ohio St.2d 173, 324 N.E.2d 735, 740, cert. denied, 423 U.S. 872, 96 S.Ct. 138, 46 L.Ed.2d 102 (1975); State v. Peters, 141 Vt. 341, 450 A.2d 332, 335 (1982).
[13] Concerning the effectiveness of remedies, we agree with the California Supreme Court:

"We are not unmindful that under present conditions the available remedies for unlawful arrestrelease followed by civil or criminal action against the offending officermay be deemed inadequate.... However, this circumstance does not elevate physical resistance to anything other than the least effective and desirable of all possible remedies; as such its rejection, particularly when balanced against the state's interest in discouraging violence, cannot realistically be considered an affirmative `seizure' or deprivation of liberty." People v. Curtis, 70 Cal.2d 347, 450 P.2d 33, 37, 74 Cal.Rptr. 713 (1969).
[14] Although Valentine's appellate counsel makes a passing reference in the petition for review to article I, section 3 of the Washington Constitution, he did not undertake a Gunwall analysis. Therefore, we will not address the state constitution. See State v. Gunwall, 106 Wash.2d 54, 720 P.2d 808, 76 A.L.R.4th 517 (1986). chose to believe the testimony of the
[15] In Lively, the trial court made findings of fact to support imposition of an exceptional sentence. Those findings described the conduct of the police. The majority in Lively indicated that while these findings cannot be considered in a sufficiency review, they can be relied on "in the context of a claimed due process violation." Lively, 130 Wash.2d at 24, 921 P.2d 1035.
[1] See Jeffrey Needle, Driving while Black D.W.B., Trial News 3 (Dec.1996) (commenting on Washington v. City of Santa Monica, 98 F.3d 1181 (9th Cir.1996), "Young African-American males frequently report being stopped and detained for reasons that are superficially pretextual. Even affluent people of color, who drive expensive or late-model cars, often report being stopped by law enforcement officers because of their race. This practice has become so prevalent that the actual justification for such detentions has become widely known as `Driving While Black (D.W.B.).'").
[2] This is similar to an approved Kansas instruction:

You are instructed that every person has a right to resist an unlawful arrest and a person may use such reasonable force as is necessary to prevent the arrest. An illegal arrest is an assault and battery and generally a person has the same right to use force in defending himself from an unlawful arrest as he would have in repelling any other assault and battery.
State v. Goering, 193 Kan. 307, 313, 392 P.2d 930 (1964).
[3] Valentine is African-American.
[4] City of Los Angeles v. Lyons, 461 U.S. 95, 116, 103 S.Ct. 1660, 1672-73, 75 L.Ed.2d 675 (1983) (Marshall, J., dissenting) addressed the topic: "It is undisputed that chokeholds pose a high and unpredictable risk of serious injury or death. Chokeholds are intended to bring a subject under control by causing pain and rendering him unconscious. Depending on the position of the officer's arm and the force applied, the victim's voluntary or involuntary reaction, and his state of health, an officer may inadvertently crush the victim's larynx, trachea, or thyroid. The result may be death caused by either cardiac arrest or asphyxiation. An LAPD officer described the reaction of a person to being choked as `do[ing] the chicken,' Exh. 44, p. 93, in reference apparently to the reactions of a chicken when its neck is wrung. The victim experiences extreme pain. His face turns blue as he is deprived of oxygen, he goes into spasmodic convulsions, his eyes roll back, his body wriggles, his feet kick up and down, and his arms move about wildly." Between 1975 and 1983, at least 16 people died as a result of LAPD's use of chokeholds. Id. at 116, 103 S.Ct. at 1672-73.
[5] The majority notes the right to resist an unlawful arrest is asserted by and sustained on behalf of a third person in the Tooley case, rather than on behalf of the victim herself. Majority at 1299. I find, however, this factual distinction to add but greater weight to the legal principle that forcible resistance by the victim is lawful. If the third party intervenor is lawfully entitled to forcibly come to the aid of the victim of an unlawful arrest, it cannot be gainsaid that the victim does not have at least the equivalent, if not greater, right to forcibly protect her own person. Rodgers v. State, 280 Md. 406, 373 A.2d 944, 947 ("Although in both Hopkin Huggett's Case and Tooley the court merely reduced a murder charge to manslaughter because of the illegal arrest, the English courts thereafter, with those cases as precedent, uniformly ruled that in cases where one was charged with assault for resisting an illegal arrest, the provocation of that arrest was sufficient to excuse the assault altogether."), cert. denied, 434 U.S. 928, 98 S.Ct. 412, 54 L.Ed.2d 287 (1977).
[6] I also challenge the factual assumption that our age is any kinder or gentler than preceding ones when it comes to arrest and incarceration. One can scarcely find a better example of this than Valentine himself.
[7] The Douglas Letters: Selections from the Private Papers of Justice William O. Douglas 162 (Melvin I. Urofsky ed., 1987) (letter "To Young Lawyers Section of the Washington State Bar Association," September 10, 1976).
[8] Nor do I believe, by the same token, that this court's pronouncements about settling matters in the courtrooms rather than the streets will have the slightest effect other than making criminals out of otherwise innocent men.
[9] S. Padover, The Complete Jefferson 1112 (1943).
[10] "[I]n the famous language of the Massachusetts Bill of Rights, the government of the commonwealth `may be a government of laws and not of men.' For, the very idea that one man may be compelled to hold his life, or the means of living, or any material right essential to the enjoyment of life, at the mere will of another, seems to be intolerable in any country where freedom prevails, as being the essence of slavery itself." Yick Wo v. Hopkins, 118 U.S. 356, 370, 6 S.Ct. 1064, 1071, 30 L.Ed. 220 (1886).
[11] George Bernard Shaw, Misalliance 85 (1914).
[12] "But `rights,' wrote Richard Blandthat least egalitarian of Revolutionary leaders'imply equality in the instances to which they belong and must be treated without respect to the dignity of the persons concerned in them.'" Bernard Bailyn, The Ideological Origins of the American Revolution 307 (1992) (1967).

Just before he died, Jefferson wrote: "All eyes are opened, or opening, to the rights of man ... [and to] the palpable truth, that the mass of mankind has not been born with saddles on their backs, nor a favored few booted and spurred, ready to ride them...." Letter to Roger Weightman (June 24, 1826) in The Life and Selected Writings of Thomas Jefferson 729-30 (Adrienne Koch & William Peden eds., 1972).
"The equality of man proclaimed by the Declaration of Independence is to be understood first of all by comparison with the inequality that characterizes man's relationship with the lower orders of living beings. In comparison with this inequality there is nothing more evident, in the familiar words of John Locke, than that no human being is marked out by nature to rule, while others are marked out for subjection.... The question who shall rule becomes relevant only after the recognition that it is the rights of the whole community, and of every member of that community for whose sake the government is instituted." Harry V. Jaffa et al., Original Intent and the Framers of the Constitution: A Disputed Question 78 (1994).
"Human virtue or excellence does indeed give some human beings, men or women, the right to hold office, the right to rule. But it is a right that can become valuable only as it is recognized as a right, not to privileges, but to service. It is a right which comes to light by virtue of the prior recognition of the equality of mankind and of the rule of law constructed upon its premises." Id. at 79.
"Hence it is that no man is good enough, in Lincoln's words, to govern another without his consent. For consent is the reciprocal of equality. And in the reciprocity of equality and consent we find that ground of morality that Lincoln found in the great proposition. The consent arising from equality assures, as we have said at the outset, that those who live under the law will share in making the law they live under, and that those who make the law must live under the law that they make." Id. at 81.
"[The] freedom of men under government, is, to have a standing rule to live by, common to everyone of that society, and made by the legislative power erected in it; a liberty to follow my own will in all things, where the rule prescribes not; and not to be subject to the inconstant, uncertain, unknown, arbitrary will of another man." John Locke, The Second Treatise of Government 126 (Everyman ed., 1993) (1689).
[13] The majority counters: "[I]n the often heated confrontation between a police officer and an arrestee, the lawfulness of the arrest may be debatable. To endorse resistance by persons who are being arrested by an officer of the law, based simply on the arrested person's belief that the arrest is unlawful, is to encourage violence...." Majority op. at 1304. If "the lawfulness of the arrest is debatable," fairness requires that both the police and the citizen be held to the same legal standard. Prudence counsels restraint on the part of each since the lawfulness of the arrest is measured by objective, not subjective, criteria. See State v. Goree, 36 Wash.App. 205, 208-09, 673 P.2d 194 (1983), review denied, 101 Wash.2d 1003 (1984) (RCW 9A.36.031(1)(a) is not a subjective statute; and "the law does not envision that all parties have to be in agreement or even understand the arrest is lawful at the time of arrest."); State v. Westlund, 13 Wash. App. 460, 466-67, 536 P.2d 20, 77 A.L.R.3d 270 ("A reasonable but mistaken belief that the arrestee was about to be seriously injured or that the arrestee was entitled to protect himself from such danger is insufficient.... Each party acts at his own peril ...."), review denied, 85 Wash.2d 1014 (1975) (emphasis added).
[14] Smith v. Holeman, 212 Ga.App. 158, 441 S.E.2d 487, 490 (1994) (if arrest was unlawful, arrestee had right to resist with all force necessary); State v. Goering, 193 Kan. 307, 392 P.2d 930, 934 (1964) (a person may use such reasonable force as is necessary to prevent an unlawful arrest); Melancon v. Trahan, 645 So.2d 722, 727 (La.App.1994) (one may use reasonable force to resist illegal arrest which threatens loss of freedom), writ denied, 650 So.2d 1183 (1995); Jenkins v. State, 232 Md. 529, 194 A.2d 618, 621 (1963) ("The common law rule adhered to in this State is that a person illegally arrested by a police officer may use any reasonable means to effect his escape to the extent of using such force as is reasonably necessary under the circumstances."); Dennis v. State, 342 Md. 196, 674 A.2d 928, 936 (person may resist unlawful arrest and resistance includes use of any reasonable means, including force), cert, granted and judgment vacated, ___ U.S. ___, 117 S.Ct. 40, 136 L.Ed.2d 4 (1996); People v. Krum, 374 Mich. 356, 132 N.W.2d 69, 72 (person may use such force as is necessary to resist unlawful arrest), cert. denied, 381 U.S. 935, 85 S.Ct. 1765, 14 L.Ed.2d 699 (1965); Smith v. State, 208 So.2d 746, 747 (Miss.1968) (person has right to use reasonable force to resist unlawful arrest); State v. Sanders, 295 N.C. 361, 245 S.E.2d 674, 679 (1978) ("A person indeed has the right to resist an unlawful arrest by the use of force, as in self defense, to the extent that it reasonably appears necessary to prevent unlawful restraint of his liberty."); Sandersfield v. State, 568 P.2d 313, 315 (Okl.Crim.1977) (person may reasonably resist unlawful arrest); State v. DeBerry, 250 S.C. 314, 157 S.E.2d 637, 640 (1967) ("A citizen is not, of course, required to submit to an illegal arrest and may use as much force as is reasonably necessary to prevent an unlawful arrest."), cert. denied, 391 U.S. 953, 88 S.Ct. 1857, 20 L.Ed.2d 867 (1968); Shelton v. State, 3 Tenn.Cr. App. 310, 460 S.W.2d 869, 874 (1970) ("We recognize and approve the general rule that every person has a right to resist an unlawful arrest, and that in preventing such illegal restraint of his liberty he may use such force as may be necessary."); State v. Gum, 68 W.Va. 105, 109, 69 S.E. 463 (1910) (person may use such force as is necessary to effectuate escape).
[15] The majority responds: "Our first response is that we are unable to understand how the dissenter knows that Valentine was in fact unlawfully arrested. As we noted above, that issue was not presented to the trial judge or the jury." Majority op. at 1304. This issue was presented to the jury. But the jury was instructed that whether the arrest was lawful or not, Valentine had no right to resist with force if the unlawful arrest threatened "only a loss of freedom." See supra at 1308. Based upon the record construed most favorably to the defendant, I conclude this arrest was unlawful. See supra at 1309-10.
[16] The majority states the jury's finding that Valentine was not entitled to self-defense should be dispositive on the issue of the reasonableness of Valentine's resistance. Majority at 1304 ("Unfortunately, the dissent has chosen to second-guess the jury's determination and substitute its own opinion of what occurred."). However, the self-defense instruction considered by the jury allows a citizen to defend himself during an arrest whether the arrest were legal or not but only if he were about to be killed or seriously injured by the police. How this standard affects the reasonableness of resisting an illegal arrest threatening liberty or injury less than death or serious injury escapes me. Contrary to the majority's assertion, the jury never passed on that issue, although at the time, Rousseau was still good law and the jury should have been so instructed.