**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

| | |
|---|---|
| STATE OF WASHINGTON, | DIVISION ONE |
| Respondent, | |
| | No. 84278-1-I |
| v. | |
| KAVEY JUMON POLLARD SR., | UNPUBLISHED OPINION |
| Appellant. | |

DWYER, J. — Kavey Pollard appeals from the judgment and sentence entered on the jury's verdicts convicting him of possession of a stolen firearm and two counts of unlawful possession of a firearm in the second degree. Pollard contends that the trial court erred by granting the State's motion to excuse a certain juror for cause and that outrageous government misconduct requires dismissal. He also seeks reversal of his convictions for reasons set forth in a statement of additional grounds. We affirm Pollard's convictions, but remand for the trial court to strike the requirement that he pay a victim penalty assessment (VPA) from Pollard's judgment and sentence.

I

In May 2021, Detective Adam Berns of the Bellevue Police Department Special Operations Group was assigned to monitor social media platforms for evidence of illegal activity. To accomplish this task, Berns created multiple fictitious profiles on different social media platforms such as Facebook,

Instagram, Twitter, and Snapchat using a "random name, random picture." He then sent friend requests to whatever users were suggested to him by the social media platforms. Some people accepted Berns's friend requests and others did not. Berns would then search through the photo and video content posted by the individuals in his "friends" lists.

On May 21, 2021, Berns observed a video posted to a Snapchat account on his friends list named "kpurkonnect."[1] Snapchat is a social media platform that allows users to post photos and videos to their personal "story" for 24 hours before disappearing. The video depicted a man, who was later identified as Pollard, sitting in a car with a pistol on his lap. Based on his experience, Berns could see that there was live ammunition in the gun because the magazine was made of transparent material. The presence of the gun drew Berns's attention to that account. A stamp on the video showed that it had been posted 21 hours previously.

Berns subsequently observed a video posted to the "kpurkonnect" account showing an individual holding a gun and moving it back and forth to show a red dot through the mounted sight. The video had been posted 14 hours before Berns viewed it. Two hours earlier, "kpurconnect" posted a video showing a person walking through the inside of an apartment building and pointing out patches on the walls where he said bullet holes had been painted over. Berns also observed a video posted to the "kpurconnect" account bearing the captions "Bellevue" and "May 26, 2021" in which the person recording was sitting in a car

---

[1] Pollard later changed the name of his Snapchat account to "kpurconnect1."

in the parking lot and recording a dark SUV with tinted windows parked nearby. A few minutes later "kpurconnect" posted videos showing the same SUV with the caption "You a Cop?" and a video showing the SUV driving away.

Berns recognized a building in the background of the video as the Sophia Way Shelter in Bellevue, which is adjacent to the 3040 Bellevue Way Apartments. Berns, who was aware that other detectives in his unit were conducting an unrelated surveillance operation in that area, contacted those detectives and learned that they had observed someone sitting nearby in a Dodge Charger. The Charger was registered to Pollard. Pollard's driver's license photograph matched the man Berns had observed in the May 21 "kpurconnect" video.

A database search revealed that a no-contact order prohibited Pollard from possessing, controlling, or owning firearms. Based on the court order and the Snapchat videos, Berns believed that Pollard had illegally possessed a gun. Berns then called the manager of the 3040 Bellevue Way Apartments, identified himself as a police officer, and asked whether they had heard of Pollard. The apartment manager informed Berns that Pollard worked there as a facilities manager and provided him with Pollard's address on file, 5000 Renton Avenue South in Seattle. The address matched the address on Pollard's driver's license and vehicle registration.

On June 1, 2021, Berns surveilled the Renton Avenue South address in an unmarked car to confirm Pollard's presence. Berns then obtained a search warrant for that address and for Pollard's car, as well as an arrest warrant for

Pollard. On June 9, 2021, police initiated a traffic stop and arrested Pollard while other officers served the search warrant at the Renton Avenue South house. When informed that police had observed him displaying a firearm on social media, Pollard stated that he rarely uses social media and does not own any firearms. Pollard also stated that he lives with his mother at a different address in Seattle and visits the Renton Avenue South address "maybe once in a blue moon."

Chantel McClure, who was at the residence when the warrant was served and who was listed on the lease, told police that she and Pollard were in a relationship and that he lived there with her. Investigators discovered three guns and ammunition in the main bedroom of the Renton Avenue South home. One was a loaded Smith & Wesson 9mm pistol with a transparent magazine and a red dot laser sight mounted on top, which was found on top of a nightstand. Although the serial number had been tampered with, Berns was able to determine that the gun had been reported stolen in 2020. On top of the same nightstand, investigators recovered loose ammunition and pieces of mail bearing Pollard's name and the Renton Avenue South address. They also found a driver's license bearing Pollard's information in the top drawer, along with men's underwear. Investigators also found a loaded Micro Draco AK-47 pistol at the top of the bedroom closet and a .40 Stoeger Cougar pistol on the bedroom floor next to the TV stand.

Police test-fired all three guns found in the bedroom and determined that they were in working order. A fingerprint matching Pollard's left middle finger

4

was found on the AK-47 pistol. A palm print matching Pollard was found on the magazine of the Cougar pistol, and a latent print found on the same magazine matched Pollard's right thumb.

The State charged Pollard by amended information with one count of possessing a stolen firearm for the Smith & Wesson and three counts of unlawful possession of a firearm in the second degree, one for each firearm found at the Renton Avenue South address.

The trial court conducted jury selection remotely, with Pollard's agreement. Seven potential jurors chose to appear in person. After administering a questionnaire, the court excused some potential jurors for hardship or for cause and scheduled the remaining jurors in panels of numerical order for voir dire.

During voir dire, the prosecutor noted that juror 71 expressed "some concerns regarding being fair and impartial" on his jury questionnaire. Juror 71 explained that he had negative experiences in his past that made him distrustful of "people in positions of authority and power [who] abuse that power." When the prosecutor asked juror 71 if he would be able to set those feelings aside to impartially consider the testimony and follow the court's instructions even though police officers and judges are "authority figures," juror 71 responded "I'm not sure. . . . [I]t is a maybe for me."

The State challenged juror 71 for cause. In response to further questioning from Pollard, juror 71 reiterated that he was "not sure if . . . something that's relatable in this case to my experience would impair my

5

judgment." Pollard objected to removing juror 71 for cause on the ground that he had not stated that he was unable to follow instructions.

The court then engaged in the following colloquy with juror 71:

> THE COURT: . . . So, it sounds like you've been through some very difficult circumstances recently, and they have to do with an authority figure who purportedly is fair -- not being fair, and it having some really adverse consequences for you that you have really strong feelings about, and that you're worried that those strong feelings may cause you to, depending on exactly what came out at trial -- but if it sort of related to your particular situation, you're concerned that you might not be able to sort of just focus on the evidence, and the facts, and the law in this case. Is that -- am I understanding you correctly?

> JUROR NUMBER 71: Correct.

> THE COURT: Okay. Knowing what you know, and it -- it sounds like you would try, to but you're just worried you would not be able to, that because -- it sounds like your personal recent experience is really deeply impactful for you, that you're just worried that in -- in a sense, something might trigger that, and if it did, then it would be hard for you to just follow the direction -- Instructions, and follow the evidence. Is -- is that right?

> JUROR NUMBER 71: Yeah. And if I may, you know, following Instruction -- if an Instruction is, "Don't talk to anyone", it's a specific Instruction that you can follow. But if somebody says, "Hey, don't be biased", it's a qualitative Instruction. At the given moment, how are -- how am I supposed to know, yes, I will follow that Instruction hundred percent? And how would I even know after the judgment that I did follow that Instruction hundred percent? That's the concern I have. Following Instructions really depends on what the Instruction is and how you can measure it.

> THE COURT: All right. Is there anything that you've seen or heard so far about the charges, about the lawyers, and about Mr. Pollard that makes you think that your personal situation is likely to be triggered in a way that will make it difficult for you to be fair and impartial?

> JUROR NUMBER 71: Not at this moment. But I'll be honest with you, even sitting here right now and -- and expressing my feelings in front of two lawyers and a Judge is making me very

6

uncomfortable. And so, the part of, you know, sitting in a Courtroom -- it is my first time, so I'm sure there -- all first timers have some anxiety, so I -- I wouldn't deny that. But so far I haven't heard anything where I would be able to tell you yes, now I'm sure whether I'll be fair, or no, I -- I won't be fair. I'm still unsure.

THE COURT: All right.

JUROR NUMBER 71: So, I'm still at that same point.

The court individually asked juror 71 to further describe the experiences that made him concerned he might not be able to be impartial. Juror 71 responded that it was "not a single isolated situation," but "multiple situations" in his personal and professional life where he observed "people in positions of authority" displaying "favoritism" and treating a "small set of people unfairly." He said he immigrated to this country 20 years ago largely "because of the law and order" but "it's a repeated hammering . . . where I see people in authority just going [scot-] free." Juror 71 also revealed that he had lost custody of his daughter in court and that he has "seen bias at every level . . . in that experience." Juror 71 said he saw people taking "the path of least resistance" and so he thought "maybe that's the way to go." Thus, his "first impression" upon coming to court was to "not care" whether the right decision was made but rather to go with "whatever gets this case sorted out quickly." He further stated that because he has been "penalized for having a minority opinion at work," he might decide to "just . . . get it over the finish line" even if he disagreed with the other jurors. Juror 71 also expressed concern that if he was "able to relate to anything in the case" it could "be a trigger point" influencing his decision. In response to a

7

follow-up question from Pollard as to whether juror 71's biases would impact his ability to serve as a juror, juror 71 admitted that "it depends on the Instruction."

The court then asked juror 71 whether he was concerned that, as a result of the "trauma and impact" he had experienced, "at some point in time you might just go along to get along . . . and agree with a verdict . . . [and] not be willing to stand up and have the minority view, even if you're persuaded that it's different than the other jurors." Juror 71 responded, "[t]hat is one of the scenarios I worry about. Not the only scenario, but yes."

The State renewed its motion to strike potential juror 71 for cause, given that "he just doesn't know if he can be fair and impartial, and it depends on how the facts of the case turn out." In opposing the motion, Pollard argued that juror 71 would make a "wonderful juror" and that his "processing" of the court's questions shows he is able to follow instructions. The trial court excused juror 71 for cause, reasoning as follows:

> I think [juror 71] said – it's not really just about following
> instructions, it['s] also about an ability to be fair and impartial. And
> he just stated repeatedly that he fears that something could come
> up that would not allow him to do that, and for that reason, although
> I think he might possibly be a wonderful juror, something might
> happen that might make him be an inappropriate juror. And he was
> clear enough about that concern that I do find that there is cause
> for excusing him, and I am going to excuse him for cause.

At trial, Detective Berns and other witnesses for the State testified as described above. Pollard and McClure testified that Pollard did not live at the Renton Avenue South address and only stopped by for social visits. McClure further stated that several other people occasionally stayed there, including her ex-boyfriend, her cousin, and her brother. Pollard and McClure also testified that

8

Pollard had permission to use McClure's address as his mailing address and to store his AK-47 pistol there pending restoration of his firearm rights. Pollard admitted owning the AK-47 pistol but denied owning the other two firearms found at the Renton Avenue South address. Pollard also admitted that he was the individual depicted in the Snapchat video holding a firearm but claimed it was an old image that someone else posted to his account.

Ultimately, the jury found Pollard guilty of possession of a stolen firearm and unlawful possession of a firearm in the second degree as charged in counts 2 and 3. The jury could not reach a verdict as to unlawful possession of a firearm as charged in count 4, so the court dismissed that charge with prejudice. At sentencing, the court imposed standard range sentences totaling eight months and authorized electronic home detention. As part of Pollard's judgment and sentence, the trial court imposed the then-mandatory $500 VPA.

Pollard appeals.

II

Pollard contends that the trial court erred by excusing juror 71 for cause. We disagree.

The Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution both guarantee a criminal defendant the right to trial by an impartial jury. To protect this constitutional right, "the trial court will excuse a juror for cause if the juror's views would preclude or substantially hinder the juror in the performance of his or her duties in accordance with the trial court's instructions and the jurors' oath." State v.

Lawler, 194 Wn. App. 275, 281, 374 P.3d 278 (2016). "The right to an impartial jury applies to both the prosecution and the defense." State v. Teninty, 17 Wn. App. 2d 957, 963, 489 P.3d 679 (2021) (citing State v. Elmore, 155 Wn.2d 758, 773, 123 P.3d 72 (2005)).

Either party may challenge a prospective juror for cause based on actual bias. RCW 4.44.130; .170(2). A juror demonstrates actual bias when the juror exhibits "'a state of mind . . . in reference to the action, or to either party, which satisfies the court that the challenged person cannot try the issue impartially and without prejudice to the substantial rights of the party challenging.'" State v. Guevara Diaz, 11 Wn. App. 2d 843, 855, 456 P.3d 869 (2020) (alteration in original) (quoting RCW 4.44.170(2)). The challenging party must establish actual bias "by proof." State v. Noltie, 116 Wn.2d 831, 838, 809 P.2d 190 (1991). To sustain a challenge based on actual bias, "the court must be satisfied, from all the circumstances, that the juror cannot disregard such opinion and try the issue impartially." RCW 4.44.190; State v. Griepsma, 17 Wn. App. 2d 606, 612, 490 P.3d 239 (2021).

On the other hand, "[e]quivocal answers alone are not sufficient to establish actual bias warranting dismissal of a potential juror." State v. Sassen Van Elsloo, 191 Wn.2d 798, 808-09, 425 P.3d 807 (2018)). The question for the trial court is "whether a juror with preconceived ideas can set them aside." Noltie, 116 Wn.2d at 839.[2] "If the court has only a 'statement of partiality without

---

[2] Noltie continues to properly state the law with respect to for cause challenges. State v. Smith, No. 102402-9, slip op. at 14 (Wash. Sept. 12, 2024), http://www.courts.wa.gov/opinions/pdf/1024029.pdf.

10

a subsequent assurance of impartiality,' a court should 'always' presume juror bias." Guevara Diaz, 11 Wn. App. 2d at 855 (quoting Miller v. Webb, 385 F.3d 666, 674 (6th Cir. 2004).  But "[w]hen the juror has expressed reservations but agrees they can set those aside to be fair and impartial, it is within the trial court's discretion to allow that juror to remain."  State v. Phillips, 6 Wn. App. 2d 651, 666, 431 P.3d 1056 (2018).

The trial court is in the best position to evaluate a juror's ability to be fair and impartial because it can assess the juror's "tone of voice, facial expressions, body language, or other forms of nonverbal communication when making . . . statements."  Lawler, 194 Wn. App. at 287.  Accordingly, we review a trial court's decision regarding whether to discharge a juror for abuse of discretion.  State v. Depaz, 165 Wn.2d 842, 852, 204 P.3d 217 (2009).  A trial court abuses its discretion when its decision is based on untenable grounds or reasons.  State v. Powell, 126 Wn.2d 244, 258, 893 P.2d 615 (1995).

Pollard suggests that the real reason potential juror 71 was struck from the jury was that he is a person of color who expressed skepticism of the criminal justice system.  He contends that juror 71's answers were merely equivocal and that juror 71's awareness of his own bias demonstrated his ability to follow the court's instructions and weigh the evidence.  But the record does not support this interpretation of events.  To the contrary, juror 71 never expressed confidence in his ability to put aside his personal feelings and try the issue impartially.  Instead, juror 71 repeatedly indicated that his ability to be fair and impartial was conditioned on whether or not something came up during trial that related to his

own negative experiences. And he steadfastly maintained this position despite the trial court's rehabilitation efforts. Given that juror 71 was unable to assure the trial court that his verdict would not be influenced by bias based on past experiences, the court did not abuse its discretion granting the State's motion to dismiss juror 71 for cause.

Pollard likens his case to State v. Gosser, 33 Wn. App. 428, 656 P.2d 514 (1982), but that case is distinguishable. In Gosser, a potential juror who was a former law enforcement officer initially indicated that he would tend to find the testimony of a police officer more credible than that of an accused person. Upon further questioning, however, the potential juror clarified "that he had an open mind as to the issue of guilt" and would not automatically believe the testimony of a witness merely because the witness was a police officer. Gosser, 33 Wn. App. at 434. Noting that the trial court was in a better position to evaluate and interpret the juror's responses than was a reviewing court, the appellate court held that the trial court did not abuse its discretion in denying a challenge for cause. Gosser, 33 Wn. App. at 434. Here, in contrast, juror 71 repeatedly stated that his ability to deliberate fairly and follow the court's instructions was conditional on the evidence presented and the instructions eventually given.

Pollard's case is more akin to two cases he seeks to distinguish, State v. Smith, 27 Wn. App. 2d 838, 534 P.3d 402 (2023), review granted, 2 Wn.3d 1011, 540 P.3d 775 (2024), and State v. Gonzales, 111 Wn. App. 276, 45 P.3d 205 (2022), overruled on other grounds by State v. Talbott, 200 Wn.2d 731, 521 P.3d 948 (2022). In Smith, we held that a potential juror should have been excused

for cause where she stated that if she was "'on the fence'" she might just go along with the other jurors during deliberations, and that only "'[i]f [she] was a 100 percent very confident'" would she not change her "'vote to whatever the rest of the group thinks.'" 27 Wn. App. 2d at 847, 850 (alterations in original). In Gonzales, a prospective juror candidly admitted that she would "'have a very difficult time'" disbelieving a police officer's testimony and "did not know if she could presume Gonzales innocent in the face of officer testimony indicating guilt." 111 Wn. App. at 278, 281. Given that the prospective juror never expressed confidence in her ability to deliberate fairly and the trial court made no attempt at rehabilitation, we held that the trial court erred in rejecting the defendant's challenge for cause. Gonzales, 111 Wn. App. at 282. Here, like the jurors in Smith and Gonzales, juror 71 never expressed unconditional confidence in his ability to deliberate fairly and follow the trial court's instructions.

Next, Pollard cites to General Rule 37 in support of the proposition that "negative experiences with the police and a distrust of police do not constitute actual bias sufficient to exclude a juror" as a matter of law. Br. of Appellant at 29. "Under GR 37, a judge must deny a party's attempt to remove a juror without cause (known as a peremptory challenge) if an objective observer *could* view race or ethnicity as *a* factor in the attempted removal." State v. Lahman, 17 Wn. App. 2d 925, 928, 488 P.3d 881 (2021). "A peremptory challenge is an objection to a juror for which there is no reason given, but upon which the court shall exclude the juror." CrR 6.4(e)(1). "[R]ace can subconsciously motivate a peremptory challenge that the attorney genuinely believes is race-neutral." State

v. Saintcalle, 178 Wn.2d 34, 87-88, 309 P.3d 326 (2013), abrogated by State v. Erickson, 188 Wn.2d 721, 398 P.3d 1124 (2017). "[E]xpressing a distrust of law enforcement or a belief that law enforcement officers engage in racial profiling" is one of seven presumptively invalid reasons to exercise a peremptory challenge under GR 37(h)(ii).

Here, however, the prosecutor challenged juror 71 for cause. Unlike a peremptory challenge for which no reason need be given, a challenge for cause based on actual bias requires proof that the juror cannot try the case impartially. RCW 4.44.190. "Safeguarding jury impartiality means a juror suffering from actual bias may be excluded from service, regardless of race or the reasons for the bias." Teninty, 17 Wn. App. 2d at 963-64. Thus, "if the party requesting a strike proves the proposed juror holds a bias that impairs the juror's ability to fairly and impartially decide the case, the strike should be sustained regardless of the juror's race or disparate impact concerns." Teninty, 17 Wn. App. 2d at 964. As discussed above, the trial court properly concluded that juror 71's actual bias warranted his dismissal from the jury. We decline Pollard's invitation to analogize the analysis applicable to peremptory challenges to the for-cause challenge at issue in his case.

Pollard further asserts that the erroneous dismissal of juror 71 prejudiced his constitutional right to a fair trial by excluding most, if not all, people of color from the jury panel that was ultimately seated in his case. We disagree. As noted above, the trial court did not abuse its discretion in dismissing juror 71 based on actual bias. In any case, erroneous dismissal of a potential juror for

cause does not automatically violate a defendant's constitutional rights to an impartial jury. Sassen Van Elsloo, 191 Wn.2d at 816. This is so because no party acquires a vested right to have a particular member of the panel sit on the jury until that juror has been accepted and sworn. Sassen Van Elsloo, 191 Wn.2d at 816. Moreover, erroneously dismissing a potential juror for cause does not result in a biased juror being impaneled, as we presume that the replacement juror is impartial. Sassen Van Elsloo, 191 Wn.2d at 816.

Pollard does not claim that any of the impaneled jurors were biased. Rather, he suggests that several other potential jurors of color may have been excluded for improper reasons, such as race or for expressing suspicion of law enforcement. But the record shows that these other potential jurors were not seated because the jury was empaneled before their numbers were reached, or, in the case of one potential juror, for hardship. Pollard's arguments to the contrary are based on speculation and conjecture. Pollard's right to a fair trial was not denied by the exclusion of a biased juror.

III

A

For the first time on appeal, Pollard argues that the police investigation in this case constituted outrageous governmental misconduct in violation of his Fourteenth Amendment right to due process. The State counters that the record is not sufficiently developed to review this claim. We agree with the State.

"[T]he conduct of law enforcement . . . may be 'so outrageous that due process principles would absolutely bar the government from invoking judicial

15

processes to obtain a conviction.'" State v. Lively, 130 Wn.2d 1, 19, 921 P.2d 1035 (1996) (quoting United States v. Russell, 411 U.S. 423, 431-32, 93 S. Ct. 1637, 36 L. Ed. 2d 366 (1973)); U.S. CONST. amend XIV. However, "'[d]ismissal based on outrageous conduct is reserved for only the most egregious circumstances.'" State v. Solomon, 3 Wn. App. 2d 895, 902, 419 P.3d 436 (2018) (quoting Lively, 130 Wn.2d at 20).

Whether the State engaged in outrageous conduct violating due process is evaluated based on the "'totality of the circumstances.'" Lively, 130 Wn.2d at 21 (quoting United States v. Tobias, 662 F.2d 381, 387 (5th Cir. 1981)). In making this determination, trial courts assess the following five factors: (1) "whether the police conduct instigated a crime or merely infiltrated ongoing criminal activity," (2) "whether the defendant's reluctance to commit a crime was overcome by pleas of sympathy, promises of excessive profits, or persistent solicitation," (3) "whether the government controls the criminal activity or simply allows for the criminal activity to occur," (4) "whether the police motive was to prevent crime or protect the public," and (5) "whether the government conduct itself amounted to criminal activity or conduct repugnant to a sense of justice." Lively, 130 Wn.2d at 22 (quoting People v. Isaacson, 44 N.Y.2d 511, 406 N.Y.S.2d 714, 378 N.E.2d 78, 83 (1978)).

A manifest error affecting a constitutional right may be raised for the first time on appeal. RAP 2.5(a)(3). It is well established that to raise a claim for the first time on appeal, "the trial record must be sufficient to determine the merits of the claim." State v. O'Hara, 167 Wn.2d 91, 99, 217 P.3d 756 (2009) (citing State

16

v. Kirkman, 159 Wn.2d 918, 935, 155 P.3d 125 (2007)).  "Otherwise the error is not 'manifest.'"  State v. Koss, 181 Wn.2d 493, 503, 334 P.3d 1042 (2014).  Thus, the question of whether we can review a claim of outrageous governmental misconduct for the first time on appeal depends on whether the record is sufficiently developed for us to determine that due process violations warrant dismissal.  See Solomon, 3 Wn. App. 2d at 903  ("[a] violation of due process must be determined as a matter of law and it is the trial court which makes the findings of fact related to that decision" (alteration in original) (quoting Lively, 130 Wn.2d at 24)).

In Lively, our Supreme Court reversed the defendant's conviction based on a claim of governmental misconduct raised for the first time on appeal.  130 Wn.2d at 27.  Based on the uncontested evidence presented at trial and the uncontested findings of fact entered by the trial court, the Supreme Court concluded that the government's conduct was so outrageous that it violated principles of due process as a matter of law.  Lively, 130 Wn.2d at 22-27.  "Thus, although the record in Lively did not include a trial court determination of whether the State engaged in outrageous misconduct, the undisputed evidence of misconduct of record therein allowed the Lively court to resolve the due process issue without the necessity of setting forth the applicable appellate standard of review."  Solomon, 3 Wn. App. 2d at 905.

Shortly after Lively was decided, our Supreme Court was again asked to consider an outrageous law enforcement misconduct claim raised for the first time on appeal.  State v. Valentine, 132 Wn.2d 1, 935 P.2d 1294 (1997).

17

Contrasting the record in Lively, the Supreme Court concluded that "the record we have been furnished does not permit us to reach a determination that the police acted in such an outrageous manner that due process considerations dictate dismissal of the charge against Valentine." Valentine, 132 Wn.2d at 23. Significantly, the Lively court was able to rely on undisputed evidence, whereas the outrageous behavior alleged in Valentine was contested by both parties. Valentine, 132 Wn.2d at 23. "The Valentine court thus emphasized that an appellate court should neither weigh the underlying facts nor resolve factual disputes prior to determining an outrageous governmental misconduct claim." Solomon, 3 Wn. App. 2d at 906. "[S]uch tasks are properly reserved to the trial court." Solomon, 3 Wn. App. 2d at 906.

Here, as in Valentine, Pollard's governmental misconduct claim is based almost entirely on facts unsupported by the record and contested by the State. Evaluating this claim would require us to resolve the parties' factual disputes, a task which we cannot undertake. Pollard's governmental misconduct claim fails because it is unreviewable.

B

Pollard also argues that the police misconduct in his case was so outrageous as to warrant dismissal under CrR 8.3(b). CrR 8.3(b) provides that "[t]he court, in the furtherance of justice, after notice and hearing, may dismiss any criminal prosecution due to arbitrary action or governmental misconduct when there has been prejudice to the rights of the accused which materially affect the accused's right to a fair trial."

Pollard did not move for dismissal under CrR 8.3(b) in the trial court. He cannot raise this rule-based claim of error for the first time on appeal. RAP 2.5(a). See also State v. Kone, 165 Wn. App. 420, 434-35, 266 P.3d 916 (2011) (defendant could not argue for the first time on appeal that the trial court should have granted his CrR 8.3(b) motion to dismiss due to purported CrR 3.3 time-to-trial violations); State v. Nowinski, 124 Wn. App. 617, 630, 102 P.3d 840 (2004) (holding that CrR 8.3(b) argument not presented to the trial court would not be considered as a basis for dismissal on appeal); State v. Basra, 10 Wn. App. 2d 279, 286, 448 P.3d 107 (2019) (a criminal prosecution is no longer ongoing postjudgment and therefore is not subject to an untimely motion to dismiss under CrR 8.3(b)). We decline to review Pollard's CrR 8.3(b) claim.

IV

Pollard contends that he is entitled to relief from the VPA imposed pursuant to his convictions. In 2023, the legislature added a subsection to RCW 7.68.035 that prohibits courts from imposing the VPA on indigent defendants as defined in RCW 10.01.160(3). See LAWS OF 2023, ch. 449, § 1. The amended version of RCW 7.68.035 applies to cases on direct appeal. See State v. Ellis, 27 Wn. App. 2d 1, 17, 530 P.3d 1048 (2023). The State does not dispute that Pollard is indigent and does not object to Pollard's request. We accept the State's concession and remand for the trial court to strike the VPA from Pollard's judgment and sentence.

V

Pollard raises several claims in a pro se statement of additional grounds for review filed pursuant to RAP 10.10. None of these additional claims demonstrate an entitlement to appellate relief.

Pollard first asserts that the State did not present sufficient evidence to support his convictions for unlawful possession of a firearm because it failed to establish that he had actual or constructive possession of the firearms. We disagree.

Evidence is sufficient to support a conviction if it permits any reasonable trier of fact to find the essential elements of the crime beyond a reasonable doubt when viewed in the light most favorable to the State. State v. Condon, 182 Wn.2d 307, 314, 343 P.3d 357 (2015). "In claiming insufficient evidence, the defendant necessarily admits the truth of the State's evidence and all reasonable inferences that can be drawn from it." State v. Drum, 168 Wn.2d 23, 35, 225 P.3d 237 (2010). Circumstantial and direct evidence are equally reliable in this context. State v. Fiser, 99 Wn. App. 714, 718, 995 P.2d 107 (2000).

Former RCW 9.41.040(2)(a)(iii) (2020) provides that "[a] person, whether an adult or juvenile, is guilty of the crime of unlawful possession of a firearm in the second degree, if the person does not qualify under subsection (1) of this section for the crime of unlawful possession of a firearm in the first degree and the person owns, has in his or her possession, or has in his or her control any firearm . . . [d]uring any period of time that the person is subject to a court order" that meets certain statutory criteria. The State must also prove knowing

possession of the firearm. State v. Anderson, 141 Wn.2d 357, 359, 5 P.3d 1247 (2000).

Possession may be actual or constructive. State v. Lee, 158 Wn. App. 513, 517, 243 P.3d 929 (2010). Actual possession means personal custody or actual physical possession. State v. Manion, 173 Wn. App. 610, 634, 295 P.3d 270 (2013). "[C]onstructive possession can be established by showing the defendant had dominion and control over the firearm or over the premises where the firearm was found." State v. Echeverria, 85 Wn. App. 777, 783, 934 P.2d 1214 (1997). In determining dominion and control, the court considers the totality of the circumstances and does not view any single factor as dispositive. State v. Collins, 76 Wn. App. 496, 501, 886 P.2d 243 (1995).

Here, the record contained sufficient evidence that Pollard actively or constructively possessed the firearms at issue. Pollard put the Renton Avenue South address on his driver's license and vehicle registration, and it was the address on file with his employer. Police observed Pollard coming and going from that address, and Pollard admitted that he sometimes stayed there. Mail addressed to Pollard at the Renton Avenue South address was found in the same bedroom where the guns were recovered, along with Pollard's driver's license and men's underwear. Pollard admitted that he owned the AK-47 pistol, which bore his fingerprint. And Pollard was seen holding what appeared to be the Smith & Wesson pistol in a video posted to his Snapchat account. Pollard and McClure offered testimony that conflicted with the State's witnesses and evidence. But we must "defer to the fact finder on issues of conflicting testimony,

credibility of witnesses, and the persuasiveness of the evidence." State v. Ague-Masters, 138 Wn. App. 86, 102, 156 P.3d 265 (2007). Viewed in the light most favorable to the State, the evidence was sufficient to support Pollard's convictions beyond a reasonable doubt.

Pollard next contends that the jury instructions were "not detailed enough for a constructive possession case to be accurate." Statement of Additional Grounds at 1. In particular, he claims that the jury instructions did not specify the type of possession case and did not contain enough detail regarding the factors needed to prove actual and constructive possession. He also asserts that the jury instructions must have confused the jury because the instructions on each of the three unlawful possession charges was identical, yet the jury convicted on only two of the three charges.

Jury instructions are sufficient if they correctly state the law, are not misleading, and permit the parties to argue their theories of the case. State v. Killingsworth, 166 Wn. App. 283, 288, 269 P.3d 1064 (2012). Juries are presumed to follow the court's instructions. State v. Jackson, 145 Wn. App. 814, 824, 187 P.3d 321 (2008). Here, instructions 15, 16, and 17, the "to convict" instructions, required the State to prove beyond a reasonable doubt that Pollard "knowingly owned a firearm or knowingly had a firearm in his possession or under his control." Instruction 13 correctly defined actual possession and constructive possession and informed the jury to "consider all the relevant circumstances in the case" in deciding whether Pollard had dominion and control over the firearms. In so doing, the jury convicted Pollard of unlawfully

possessing the Smith & Wesson and the AK-47, but was unable to reach a verdict as to the Cougar. The jury instructions accurately stated the law and were not confusing or misleading.

Pollard next asserts that he received ineffective assistance of counsel. This is so, he contends, because his attorney did not challenge the search warrant, did not utilize Pollard's proposed cross-examination questions, and did not object to what Pollard characterizes as misleading jury instructions or provide the court with sufficiently detailed instructions.

A successful claim of ineffective assistance of counsel requires a defendant to establish both objectively deficient performance and resulting prejudice. State v. Emery, 174 Wn.2d 741, 754-55, 278 P.3d 653 (2012). Pollard does not explain why he believes counsel should have challenged the search warrant. Nor does he provide a list of questions he believes counsel should have asked on cross-examination. Pollard has not sufficiently identified the nature of these alleged errors to permit appellate review. See RAP 10.10(c) (appellate court will not consider statement of additional grounds for review unless it informs the court of the nature and occurrence of alleged errors).

Pollard's challenge to the jury instructions is sufficiently developed for review. However, as discussed above, the jury instructions correctly stated the law and were not misleading, so counsel was not ineffective for failing to object to them. Pollard's ineffective assistance of counsel claim fails. Accordingly, none of Pollard's additional grounds warrant appellate relief.

Affirmed in part, reversed in part, and remanded.

_Dwyer, J._

WE CONCUR:

_Díaz, J._　　　　　　　　_Coburn, J._